UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER BARBATO and NORTH JERSEY PUBLIC ADJUSTERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> INTERSTATE FIRE & CASUALTY COMPANY, INDEPENDENT SPECIALTY INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S LONDON - SYNDICATE 2357, CERTAIN UNDERWRITERS AT LLOYD'S AND OTHER INSURERS SUBSCRIBING TO BINDING AUTHORITY B604510568622002, and ADRIENNE A. HARRIS, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, <br><br> Defendants. | Case No:  1:25-cv-05312 (JGK) |

I, Brian P. Henry, Esq., hereby certify as follows:

1.      I am a partner at Rolfes Henry Co., LPA, counsel for Defendants Interstate Fire & Casualty Company, Independent Specialty Insurance Company, Certain Underwriters at Lloyd's London – Syndicate 2357, and Certain Underwriters at Lloyd's and Other Insurers Subscribing to Binding Authority B604510568622022 (collectively referred to as "Defendants") in this lawsuit.

2.      I submit this certification attaching .pdfs of the unpublished authority in Defendants memorandum or law and reply memorandum of law, which were submitted in support of Defendants' motion to dismiss.

1

3.      Attached hereto as **Exhibit 1** is a true and accurate copy of <u>Glantz v. James River Grp. Holdings, Ltd.</u>, No. 23-CV-10000 (LJL), 2025 WL 278440, at *1 (S.D.N.Y. Jan. 23, 2025).

4.      Attached hereto as **Exhibit 2** is a true and accurate copy of <u>Kasada, Inc. v. Access Capital, Inc.</u>, No. 01 Civ. 8893, 2004 WL 2903776, *3, *11–12 (S.D.N.Y. 2004).

5.      Attached hereto as **Exhibit 3** is a true and accurate copy of <u>Midwest Railcar Corp. v. Everest Railcar Servs., Inc.</u>, No. 16 CIV. 604, 2017 WL 1383765, at *8 (S.D.N.Y. Apr. 13, 2017).

6.      Attached hereto as **Exhibit 4** is a true and accurate copy of <u>Shepard Industries, Inc. v. 135 East 57th Street, LLC</u>, No. 97 CIV. 8447, 1999 WL 728641, *3 (S.D.N.Y. Sept. 17, 1999).

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


August 8, 2025

By: Brian P. Henry, Esq. (5975024)

/s/ Brian P. Henry, Esq.
ROLFES HENRY CO., LPA
5415 87th Street East
Bradenton, Florida 34211
T: (941) 684-0100
F: (941) 684-0109
E:      bhenry@rolfeshenry.com
E:      kmcclintock@rolfeshenry.com

2

# Exhibit 1

2025 WL 278440
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Paul GLANTZ, individually and on behalf
of all others similarly situated, Plaintiff,

v.

JAMES RIVER GROUP HOLDINGS,
LTD., Frank N. D'Orazio, and
Sarah C. Doran, Defendants.

23-cv-10000 (LJL)
|
Signed January 23, 2025

**Attorneys and Law Firms**

Gregory Bradley Linkh, Glancy Prongay & Murray LLP. New York, NY, for Plaintiff.

Maeve L. O'Connor, Susan Reagan Gittes, Debevoise & Plimpton LLP, New York, NY, for Defendants.

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

 **\*1** Defendants Frank N. D'Orazio ("D'Orazio"), Sarah C. Doran ("Doran" and with D'Orazio, "Individual Defendants") and James River Group Holdings, Ltd. ("James River" or the "Company" and, together with the Individual Defendants, "Defendants"), move, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), to dismiss the amended complaint. Dkt. No. 21.

For the reasons that follow, Defendants' motion is granted.

**BACKGROUND**

For purposes of this motion, the Court assumes the truth of the well-pleaded allegations of the amended complaint as supplemented by the documents incorporated by reference.

**A. The Relevant Parties**

James River is a holding company incorporated under the laws of Bermuda and doing business in Bermuda that owns and operates a group of specialty insurance companies. Dkt. No. 20 ¶¶ 14, 18. The group includes four reportable segments: Excess & Surplus ("E&S") Lines, Specialty Admitted Insurance, Casual Reinsurance, and Corporate and Other. *Id.* ¶ 18. D'Orazio was the company's Chief Executive Officer ("CEO"). *Id.* ¶ 15. Doran was the Company's Chief Financial Officer ("CFO"). *Id.* ¶ 16.

Lead Plaintiff Madhav Ghimire ("Ghimire") is an individual who purchased 10,000 shares of James River stock on September 15, 2023. *Id.* ¶ 13; Dkt. No. 13-2.

**B. James River's Accounting Issues and Statements**

The case grows out of an error in James River's accounting for reinstatement premiums in its E&S lines segment, which it disclosed on November 7, 2023. Through James River Insurance Company ("JRIC") and its wholly-owned subsidiary James River Casualty Company, the E&S lines segment offers commercial excess and surplus lines liability and property insurance in every state of the United States, as well as in the District of Columbia, Puerto Rico, and the United States Virgin Islands. Dkt. No. 20 ¶ 18. The majority of James River's revenue comes from the E&S lines market. *Id.* ¶¶ 18, 50. E&S lines insurance, also known as surplus lines insurance, is a specialty market that covers risks that standard insurance carriers will not underwrite or price, such as that borne by businesses with high risks including businesses in the construction, building, roofing, and commercial transportation industries. *Id.* ¶ 19.

To limit the Company's exposure to potential losses, protect against the aggregation of several risks in a common loss occurrence, and provide additional capacity for growth, James River routinely purchases reinsurance for E&S lines. *Id.* ¶ 20. Through such reinsurance, James River transfers, or cedes, all or part of its exposure to the reinsurer in return for a portion of the premium. *Id.* When an insurer contracts for reinsurance under an "excess of loss" agreement, the reinsurer agrees to assume all or a portion of the ceding company's losses in excess of a specified amount in exchange for a negotiated portion of the premium. *Id.* When the insurer cedes a portion of its exposure through "quota share" reinsurance, the reinsurer assumes a specified percentage of the ceding company's losses arising out of a defined class of business in exchange for a corresponding percentage of the premiums. *Id.* Reinsurance, however, is not static. Reinsurance contracts often include a provision that requires the ceding company

to pay an additional premium to reinstate the initial coverage purchased each time the coverage is "used up" by a loss. *Id.* ¶ 21.

**\*2** Under Generally Accepted Accounting Principles ("GAAP"), an insurance company is required to disclose, either on the income statement or in the notes to the financial statements, the amounts of premiums from direct business and reinsurance premiums ceded (on both a written basis and an earned basis) and recoveries recognized under reinsurance contracts. *Id.* ¶ 34. Premiums paid to reinsurers are presented as a reduction in premium revenues attributable to direct insurance written while the reinsurance benefit is presented as a reduction in claims expense. *Id.* GAAP directs how the insurer is to account for a short-duration insurance or reinsurance contract with a retrospective rating provision, in which events in one period of the contract create rights and obligations in another. *Id.* ¶ 35. Upon a loss event when the reinstatement premium is obligatory, the ceding insurer recognizes a liability to the extent that the ceding insurer has an obligation to pay cash or other consideration to the reinsurer that would not have been required absent the loss experience to date. *Id.* ¶ 36. Furthermore, the ceding insurer must recognize the entire additional reinstatement premium as an immediate expense. *Id.*

On November 7, 2023, after the market closed, James River issued a press release announcing its third quarter 2023 financial results and stating that it had "identified an error in the accounting for reinstatement premium ... in its Excess & Surplus Lines segment" in the previously issued financial statements for the second quarter of 2023. *Id.* ¶¶ 3, 77. The Company also stated that it had identified a material weakness in its internal controls over financial reporting because the "Company's control over the review of the determination of when reinstatement premiums for reinsurance should be recognized did not operate effectively." *Id.* The Company announced "[i]n determining whether the Company owed reinstatement premium on one of its treaties, the Company found that the liability for the reinstatement premium payable on three claims was recorded in a subsequent quarter of 2023 from the quarter in 2023 when the incurred losses that triggered the reinstatement premium were recorded.... A similar error occurred in the three months ended March 31, 2023." *Id.* ¶ 38. James River filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") on November 8, 2023. *Id.* ¶ 40. In the Form 8-K, James River stated in relevant part:

In preparing its Quarterly Report on Form 10-Q for the period ended September 30, 2023, management of the Company identified an error in the accounting for reinstatement premium on a specialty casualty reinsurance treaty in its Excess & Surplus Lines segment (the "Reinstatement Premium") in the Company's previously issued condensed consolidated financial statements as of and for the three and six months ended June 30, 2023 (the "Prior Financial Statements"). Certain of the Company's reinsurance treaties include a requirement to pay additional reinsurance premiums after the initial coverage limit has been exhausted. In determining whether the Company owed reinstatement premium on one of its treaties, the Company found that the liability for the reinstatement premium payable on three claims was recorded in a subsequent quarter of 2023 from the quarter in 2023 when the incurred losses that triggered the reinstatement premiums were recorded. This error resulted in understatements of ceded written premium, and overstatements of net written premium and net earned premium of $9.4 million and $12.3 million for the three and six months ended June 30, 2023, respectively, and overstatements of net income of $7.8 million and $10.4 million for the three and six months ended June 30, 2023, respectively, within the condensed consolidated statements of income and comprehensive income (loss), as well as corresponding effects on the condensed consolidated balance sheet and condensed consolidated statements of changes in shareholders' equity as of and for the three and six months ended June 30, 2023 in the original Quarterly Report on Form 10-Q for such period filed with the U.S. Securities and Exchange Commission on August 8, 2023 (the "Original Filing"). A similar error occurred in the three months ended March 31, 2023, which was deemed immaterial.

**\*3** *Id.* The Company further stated:

The Company's management has assessed the effect of the foregoing on the Company's internal control over financial reporting and disclosure controls and procedures. The Company's control over the review of the determination of when reinstatement premiums for reinsurance should be recognized did not operate effectively as of March 31, 2023 and June 30, 2023 resulting in a material weakness in the Company's internal control over financial reporting. Based on this assessment, the Company's disclosure controls and procedures were ineffective in the first and second quarter of 2023.

*Id.* After the November 7, 2023 disclosure, the Company's stock price fell 37.5% to close at $8.44 on November 9, 2023, on "unusually heavy" trading volume. *Id.* ¶¶ 4, 78.

On November 14, 2023, James River filed an amendment on Form 10Q/A with the SEC ("Restatement"), restating its financial statements as of June 30, 2023, and for the three- and six-month periods then ended. *Id.* ¶ 5. James River stated in the Form 10Q/A that it had recorded $2.9 million in Q1 2023 reinstatement premiums and $9.4 million in Q2 2023 reinstatement premiums one quarter too late, respectively. *Id.* ¶¶ 5, 79. James River's overstatements of its income before taxes, net income, and diluted earnings per share during the second quarter of 2023 each exceeded 40%. *Id.* ¶¶ 5, 79–80. The Company did not restate its results for the first quarter of 2023. *Id.* ¶ 5.

Plaintiff alleges that the following press releases and reports containing James River's financial results were false and misleading as a result of the accounting error: (1) James River's May 2, 2023 press release announcing its financial results for the first quarter of 2023; (2) James River's Form 10-Q reporting its financial and operational results for the first quarter of 2023; (3) James River's August 7, 2023 press release announcing its second quarter 2023 financial results; and (4) James River's August 8, 2023, quarterly report filed on Form 10-Q announcing its financial and operational results for the quarter ended June 30, 2023. *Id.* ¶¶ 67–76. According to Plaintiff, James River's disclosures improperly accounted for reinsurance premiums. *Id.* ¶¶ 69, 74. The disclosures also falsely and misleadingly stated that there were no changes in the Company's internal control over financial reporting that had materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting, whereas Defendants knew or recklessly disregarded that James River did not have effective internal controls over financial reporting due to its ineffective accounting system and improper reserve practices. *Id.* ¶¶ 71, 76.

Plaintiff brings this action on behalf of all persons and entities that purchased or otherwise acquired James River common stock between May 2, 2023, and November 7, 2023, inclusive (the "Class Period"). *Id.* ¶¶ 2, 81.

### C. Allegations of Scienter

The complaint relies, in part, on information provided by four confidential witnesses ("CWs"), each of whom worked for JRIC, the Company's E&S line subsidiary, but only one of whom was employed after May 2023. CW-1 was the senior accounting manager at JRIC from July 2022 to December 2022 and reported to the Assistant Controller. *Id.* ¶ 24 & n.1. CW-1 stated that JRIC used several different ledger systems instead of one general ledger system and, as a result, JRIC did not have a single database set with all premium amounts available to its accounting function. *Id.* ¶ 24. She explained that without the ability to access all lines of business, financial statements would be incorrect. *Id.* CW-2 was the senior premium auditor for JRIC from October 2022 to July 2023 and confirmed CW-1's statement that the underwriting data was not connected to the accounting system. *Id.* ¶ 25. According to CW-2, the accounting system was "antiquated and slow." *Id.* CW-4 joined JRIC as claims liability manager in November 2022 and was employed through March 2024, reporting to the AVP of complex claims. *Id.* ¶¶ 27–28. CW-4's role included overseeing claims examiners and handlers and reviewing coverage, letters, authority, and large loss reports. *Id.* ¶ 28. CW-4 stated that there was a major backlog of New York Labor Law claims, and many were "grossly under reserved." *Id.* CW-4 described the environment at James River Insurance Company as lacking in communication, engagement, and consistency, and recalled that the AVP would improperly reject claims, resulting in third-party actions and declaratory judgments against JRIC. *Id.* CW-3 was employed as the New York Labor Law complex claims specialist for JRIC from September 2022 through March 2023 and reported to the AVP of complex claims and then to CW-4. *Id.* ¶ 27. CW-3 was hired to resolve a backlog of hundreds of New York Labor Law claims which were multi-million dollar several-layer exposures, most of which had only a $5,000 reserve on them even though they were usually worth at least $1 million. *Id.* As a result, CW-3 believed that the Company did not adequately reserve for its claims. *Id.* She also stated that the AVP would often deny claims in bad faith and told CW-3 never to communicate directly with the underwriting function. *Id.*

### PROCEDURAL HISTORY

**\*4** This case was initiated by complaint filed on November 13, 2023. Dkt. No. 1.

On March 25, 2024, the Court entered an order approving Ghimire's motion to serve as Lead Plaintiff and appointing The Rosen Law Firm, P.A., to serve as Lead Counsel under the Private Securities Litigation Reform Act ("PSLRA"). Dkt. No. 17.

Plaintiff filed the amended complaint on May 24, 2024. Dkt. No. 20. The amended complaint asserts claims against all Defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated thereunder, and against D'Orazio and Doran for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *Id.*

On July 23, 2024, Defendants filed the instant motion to dismiss along with a memorandum of law and a declaration of counsel in support of the motion. Dkt. Nos. 21–23. Plaintiff filed a memorandum of law and a declaration of counsel in opposition to the motion on September 6, 2024. Dkt. Nos. 24–25. On October 8, 2024, Defendants filed a reply memorandum of law in further support of the motion. Dkt. No. 26.

**LEGAL STANDARD**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) (6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

"The [PSLRA] imposes additional requirements on a plaintiff bringing a private securities fraud action." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 381 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). As relevant here, the PSLRA imposes a heightened pleading standard for scienter, such that a "complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). When determining whether a strong inference of scienter exists, the facts alleged must be "taken collectively" rather than viewed independently or in isolation. *Id.* at 323.

**\*5** The parties dispute which documents the Court may consider on the motion to dismiss. Defendants append the following exhibits to their motion to dismiss: (A) James River's Form 10-K, filed on February 29, 2024; (B) a James River press release dated April 16, 2024 and entitled "James River Completes Sale of Casualty Reinsurance Business to Flemings Holdings; (C) James River's Form 10-Q/A filed on November 14, 2023; (D) James River's Form 8-K filed on November 8, 2023; (E) James River's press release, dated November 7, 2023, and entitled "James River Announces Third Quarter 2023 Results"; (F) James River's historical stock prices from Yahoo Finance; (G) a James River press release dated November 8, 2023, entitled "James River Announces Agreement to Sell Casualty Reinsurance Business to Flemings Holdings"); (H) an equity research report on James River by Keefe, Bruyette & Woods, dated November 8, 2023; (I) an equity research report on James River by Barclays, dated November 8, 2023; and (J) an equity research report on James River by Barclays, dated November 9, 2023. Plaintiff objects to the Court's consideration of any of Defendants' exhibits on the motion to dismiss.

Plaintiff's objection is ill-founded with respect to exhibits C, D, and E. Those documents are referred to and quoted in the amended complaint, which relies upon them for their contents. Dkt. No. 20 ¶¶ 3, 5, 37–38, 40–41, 77, 79–80. They are therefore deemed incorporated by reference such that the Court may consider the documents for their contents and the fact that they were filed, but not for their truth. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 238–39 (S.D.N.Y. 2023); *Gray*, 454 F. Supp. 3d at 382–83. The Court may also take judicial notice of Exhibit F, which contains James River's "well publicized stock prices." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 n.1 (2d Cir. 2012); *see also In re China Organic Sec. Litig.*,

2013 WL 5434637, at *8 (S.D.N.Y. Sept. 30, 2013) (taking judicial notice of stock prices published on Yahoo Finance); *U.S. Sec. & Exch. Comm'n v. Passos*, 2024 WL 5203022, at *7 (S.D.N.Y. Dec. 21, 2024) (same). However, Plaintiff's objection is well-founded with respect to exhibits A, B, G, H, I, and J. Those documents are neither referenced in, nor appended to, the amended complaint and they are not susceptible to judicial notice. The Court therefore does not consider those documents in deciding the motion to dismiss.

## DISCUSSION

To plead a claim for damages under Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b–5(b), a plaintiff must satisfy each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation omitted); *see Matrixx*, 563 U.S. at 37–38; *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

Defendants argue that the amended complaint should be dismissed because Plaintiff does not allege particularized facts supporting a strong inference of scienter. Dkt. No. 22 at 11–23; Dkt. No. 26 at 2–10. Defendants also argue that, because the complaint does not allege a primary violation of Section 10(b) of the Exchange Act or Rule 10b-5 promulgated thereunder, Plaintiff's Section 20(a) claims must be dismissed as well. Dkt. No. 22 at 23; Dkt. No. 26 at 10.

### I. Scienter

"The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege is 'an intent to deceive, manipulate or defraud.' " *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000)). "A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.' " *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)); *see also Novak v. Kasaks*,

216 F.3d 300, 311 (2d Cir. 2000) ("A strong inference of scienter "may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.").

**\*6** "When the defendant is a corporate entity, ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "[I]t is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Dynex Cap.*, 531 F.3d at 195–96).

Plaintiff does not argue that the Individual Defendants or any individual whose intent could be imputed to James River acted with the motive and opportunity to commit fraud. *See* Dkt. No. 24 at 10.[1] However, "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." is not fatal." Tellabs, 551 U.S. at 325., 264 F.3d at 142.

1    Plaintiff did not respond to Defendants' argument that the amended complaint offers no allegation of motive. Dkt. No. 22 at 11–13. Accordingly, the claim that Defendants acted with the motive and opportunity to commit fraud is deemed abandoned. *See Jackson v. Federal Express*, 766 F.3d 189, 196 (2d Cir. 2014). Regardless, Plaintiff acknowledges "[t]he absence of motive." Dkt. No. 24 at 10.

Plaintiff argues that it adequately pleads James River's reckless misbehavior or consciousness (1) "because the E&S lines segment was James River's core business and the Individual Defendants stated to investors that they had designed and implemented controls with no material weaknesses," and (2) because the CW's statements regarding "management of the finance and claims functions at JRIC"

show that the Company failed to maintain "a usable, integrated accounting system capable of producing accurate financial statements and ... to properly reserve for claims, respectively." Dkt. No. 24 at 11–16. Viewed in the aggregate, Plaintiff's allegations fail to raise the required strong inference of scienter.

Plaintiff does not allege any other facts sufficient to establish that anyone whose intent could be imputed to James River acted with the intent to defraud. Scienter can be pled by allegations that "defendants ... had access to non-public information contradicting their public statements." *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Dynex Cap.*, 531 F.3d at 196 (quoting *Novak*, 216 F.3d at 309).[2] Plaintiff's amended complaint is devoid of allegations of specific facts, reports, statements, or observations to which the Individual Defendants had access, and which contained information contrary to James River's public disclosures. *See id.*; *In re Turquoise Hill*, 625 F. Supp. 3d at 236–38; *Pirnik v. Fiat Chrysler Autos., N.V.*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017).

2      "As the courts have made clear, contrary facts may also be learned in other ways, including through observation." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 237 (S.D.N.Y. 2022) (citing *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020)).

**\*7** The allegation that James River restated its financial results cannot alone provide the requisite strong inference of scienter. Companies may restate their financial results because they have made a mistake as well as because they have acted recklessly or intentionally. GAAP requires the company to report any material error in the financial statements of a prior period discovered after the financial statements are issued as an error correction by restating the prior-period financial statements, including errors resulting from mathematical mistakes, mistakes in the application of GAAP, or the oversight or misuse of facts that existed at the time the financial statements were prepared. Dkt. No. 20 ¶¶ 42–43, 46. A sufficiently large write-off or restatement can contribute to an inference of scienter, *see, e.g.*, *In re Scholastic*, 252 F.3d at 77; *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *see also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544, 551–53

(S.D.N.Y. 2017), but it cannot alone establish scienter, *see Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 413–14 (S.D.N.Y. 2020); *Wyche v. Advanced Frainage Sys., Inc.*, 2017 WL 971805, at *16 (S.D.N.Y. Mar. 10, 2017) (citing *Rothman*, 220 F.3d at 90, 92), *aff'd*, 710 F. App'x 471 (2d Cir. 2017). Such a restatement will suffice to show scienter only "where there is something about the write-off or restatement that supports the inference that the defendants knew information contradicting their public statements." *Chapman*, 466 F. Supp. 3d at 414. Without more, a defendant's mere ignorance of "the extent of the Company's accounting improprieties" does not rise to the level of recklessness. *Wyche*, 2017 WL 971805, at *16; *see also id.* ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.") (quoting *S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 474 (S.D.N.Y. 2008)); *see also In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 547 (S.D.N.Y. 2024) (citing *Novak*, 216 F.3d at 309).

Plaintiff argues that scienter should be inferred because of the Individual Defendants' personal roles in designing and evaluating the Company's internal controls. Dkt. No. 24 at 11. Indeed, such personal involvement may give rise to a finding of scienter where the corporate actor's role makes them aware of information contradicting the company's public statements. *See, e.g., Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 247–48 (S.D.N.Y. 2012) ("[I]n light of the personal involvement of [the CFO] in designing and evaluating [the company's] internal controls, the stark realities about the inadequacies of the internal controls that were revealed in the March 2011 restatement, the audit delays and control deficiencies expressly raised to him during the class period, and the fact that the Tax Department uniquely was experiencing problems even while he knew that its functions were of specific importance to the Company, the amended complaint sufficiently alleges scienter with regard to his statements" including his internal controls certifications); *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 395 (S.D.N.Y. 2007) ("[T]estimony from CWs that the Company's reporting systems were in such poor condition that it could not properly track unprocessed claims and that the individual in charge of maintaining financial reporting systems in the United States was dismissed in connection with these failures ... sufficiently support the inference that defendants were reckless").

However, the amended complaint does not identify any information the Individual Defendants' personal roles would

Case 1:25-cv-05312-JGK    Document 17-1    Filed 08/08/25    Page 10 of 46

have elicited so as to give rise to an inference of scienter that could be imputed to the Company. Plaintiff alleges that management assessed the disclosure controls and procedures of James River as well as its internal control over financial reporting as effective as of December 31, 2022, Dkt. No. 20 ¶ 63, and that the Company's first and second quarter 2023 Form 10-Qs indicated that there were no changes in the internal control over financial reporting that would have materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting, *id.* ¶ 64. The Company's Form 10-K indicated that management was "responsible for establishing and maintaining adequate internal control over financial reporting" and the Individual Defendants' SOX certifications acknowledge the direct responsibility of the Individual Defendants for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting. *Id.* ¶ 65. But none of this indicates Individual Defendants' contemporary awareness of the internal controls failures. "[T]hese certifications typically 'add nothing substantial to the scienter calculus' because 'allowing Sarbanes-Oxley certifications to create an inference of scienter in every case where there was an accounting error ... by a public traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA.' " *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018) (quoting *Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016)); *accord N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *22 (S.D.N.Y. Sept. 30, 2016) (Sullivan, J.). Plaintiff instead falls back on the fact that James River subsequently reported that it did not have effective controls over financial reporting during the Class Period. *Id.* ¶¶ 71, 76. But that argument rests on impermissible fraud-by-hindsight. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.). "[T]he Complaint does not adequately allege that the Defendants possessed actual knowledge of deficiencies in the Company's internal controls at the relevant time." *In Re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *2 (2d Cir. Oct. 25, 2022) (summary order).

**\*8** Plaintiff invokes the "core operations" doctrine, arguing that scienter can be interred because of "the critical importance of the JRIC unit to James River's business." Dkt. No. 24 at 12–13. "Under the core operations doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of

a business, such as events affecting a significant source of income." *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *17 (S.D.N.Y. May 19, 2023) (quoting *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020) (Nathan, J.)). The core operations doctrine, however, "has been thrown into doubt by the enactment of the PSLRA in 1995." *In re Turquoise Hill*, 625 F. Supp. 3d at 239; *see In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *In re Turquoise Hill*, 625 F. Supp. 3d at 239 (quoting *In re Rockwell Med.*, 2018 WL 1725553, at *14). Put differently, "core-operations allegations are 'supplementary'; that is, they are not 'independently sufficient means to plead scienter.' " *Saraf v. Ebix, Inc.*, 632 F. Supp.3d 389, 398 (S.D.N.Y. 2022) (citation omitted). Where Plaintiff's other allegations fall short of supporting a compelling inference of scienter, allegations that a misstatement affected a core operation generally cannot fill the gap. *See In re AppHarvest*, 684 F. Supp. 3d at 246; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (Sullivan, J.).

Even when viewed as "supplementary but not independently sufficient means to plead scienter," *In re Wachovia*, 753 F. Supp. 2d at 353, Plaintiff's core operations allegations still fall short. Plaintiff alleges that the E&S segment was the Company's largest segment, accounting for 61.5% of its gross written premiums and 78.7% of its net written premiums for the year ended December 31, 2022. Dkt. No. 20 ¶ 50. The question here, however, is not whether the E&S segment was a core operation, but whether E&S's reinsurance recording itself was a core operation. *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 872–73 (S.D.N.Y. 2011) (Sullivan, J.), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012); *In re Wachovia*, 753 F. Supp. 2d at 358. And Plaintiff has not sufficiently alleged that James River's reinsurance business was "sufficiently core" to its business that the accounting error would have been apparent to the Individual Defendants. *See In Re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022); *Mechel OAO*, 811 F. Supp. 2d at 872–73. Fundamentally, James River's core operation is insurance, not accounting for reinsurance. *See Reilly*, 2018 WL 3559089, at *18 (citing *In*

*re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005)).

Plaintiff also relies, in large part, on the statements from the alleged confidential witnesses regarding the Company's accounting system and reserves. The amended complaint, however, "provides no connective tissue between those employees and the alleged misstatements." *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020). Two of the CWs assert that, during a period that primarily precedes the Class Period, the underwriting data at JRIC was not connected to the accounting system and that the company did not have a single general ledger with all premium amounts available to its accounting function. Dkt. No. 20 ¶¶ 24–26. Two other CWs make allegations regarding the Company's handling of claims under the New York Labor Law and assert that the Company did not adequately reserve for those claims and would frequently deny claims in bad faith. *Id.* ¶¶ 27–29. Plaintiff asserts that the amended complaint "pleads that the management of the finance and claims functions at JRIC acted with fraudulent intent by failing to maintain a usable, integrated accounting system capable of producing accurate financial statements and by failing to property reserve for claims." Dkt. No. 24 at 13. There are numerous problems with these allegations. For one, there are no allegations that any of the CWs reported directly or indirectly to either Individual Defendant or anyone else whose intent could be imputed to James River. CW-1 reported to the Assistant Controller and CW-4 reported to the AVP of complex claims. Dkt. No. 20 ¶¶ 24–25 & n.1. There are no allegations where in the reporting structure those individuals fell or what involvement, if any, they had in the preparation of the statements alleged to be false or misleading. "Not one of these former employees indicates that he or she communicated his or her concerns to 'an Individual Defendant, let alone that they persuaded the defendants (or notified them of facts demonstrating) that the [accounting] was inadequate.' " *Wyche*, 2017 WL 971805, at *15 (quoting *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013)); *see also Thomas v. Shiloh Indus., Inc.*, 2018 WL 4500867, at *4 (S.D.N.Y. Sept. 19, 2018) (noting that "the fact that an employee is not part of senior management weighs strongly against imputation"). "Nor did any Individual Defendant, or anyone acting at the direction of an Individual Defendant, request that any of the former employees engage in fraudulent conduct on the Company's behalf." *Wyche*, 2017 WL 971805, at *15.

**\*9** Furthermore, there are no allegations how, if at all, the issues observed by the CWs relate to the error in financial statements which Plaintiff alleges constituted a misstatement. The amended complaint asserts that in two quarters in 2023, James River failed to record the reinstatement premium payable on three claims in connection with one of its treaties in the quarter when the incurred losses triggered such premium. Dkt. No. 20 ¶ 38. The CWs make claims regarding the general ledger and the payment of claims under the New York Labor Law. There are no allegations that the issues observed by any of the CWs resulted in a misstatement of the financial statements. For all that appears from the amended complaint, the issue with respect to the reinsurance treaty and those with respect to the general ledger and the payment of New York Labor Law claims are unrelated. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014) ("Though the CWs offer their thoughts and opinions as to various quality issues experienced by the company prior to 2013, they do not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Ultimately, Plaintiff's allegations fail to give rise to a strong inference of scienter. Defendant's motion to dismiss Plaintiff's claim for violation of Section 10(b) is therefore granted.

## II. Control Person Liability

Because Plaintiff has failed to plead a primary violation of Section 10(b), the Section 20(a) claim against the Individual Defendants necessarily fails. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 778 (2d Cir. 2010); *Rombach*, 355 F.3d at 178; *Chapman*, 466 F. Supp. 3d at 414.

## III. Leave to Amend

Plaintiff requests that "[i]n the event the Court finds that any count of the Complaint fails to state a claim, Plaintiffs should be granted leave to amend." Dkt. No. 24 at 16 n.7. Defendants request that dismissal be with prejudice due to futility. Dkt. No. 26 at 10 n.4. "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice

to the opposing party." *Id.* Plaintiff has not "proffered the content of any proposed amendment or given any clue as to how the complaint's defects would be cured." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 530 n.19 (S.D.N.Y. 2020) (citation omitted). Plaintiff's failure to plead scienter does not appear to be the product of inartful pleading but rather a substantive issue that makes repleading futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The amended complaint is dismissed with prejudice.

**CONCLUSION**

Defendants' motion to dismiss the amended complaint with prejudice is GRANTED.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 278440

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

2004 WL 2903776
United States District Court,
S.D. New York.

KASADA, INC., John Michaels, Inc.,
Gabbey Design Group, Inc., Garment
Makers, Inc., Theordore Sadaka, Karen
Sadaka and Gladys Sadaka, Plaintiffs,
v.
ACCESS CAPITAL, INC., Westgate
Financial Corp., Finova Capital, Inc.,
UCC Asset Management Corp., Star
Funding, Inc., Omni Commerical, L.L.C.,
Commercial Services, Inc., d/b/a C.I.T.
Group, Rosenthal & Rosenthal, Miles M.
Stuchin and Richard I. Simon, Defendants.

No. 01 Civ. 8893(GBD).
|
Dec. 14, 2004.

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** Plaintiffs bring suit alleging price fixing and monopoly claims in violation of the Sherman Act §§ 1, 2, the Clayton Act § 4, the New York State Donnelly Act, and pendant common law claims. Defendants filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons below, defendants' motions to dismiss are granted in part and denied in part.

I. *Background*

Plaintiffs are garment manufacturers, their principals and related entities who bring suit against various credit institutions alleging price fixing and monopoly in violation of federal and state antitrust statutes and state common law. Plaintiffs Kasada, Inc., John Michaels, Inc., Gabbey Design Group, Inc. and Garment Makers, Inc. are corporations engaged in the business of domestic garment manufacturing. Complaint at 2-3, ¶¶ 4-7. Plaintiff Theodore Sadaka is the

principal officer of plaintiffs Garment Makers, Inc. and John Michaels, Inc.. Plaintiff Karen Sadaka is a principal officer of plaintiff Kasada, Inc. Plaintiff Gladys Sadaka is a principal officer of plaintiff Gabbey Design Group, Inc. *Id.* at 3, ¶ 8.

Plaintiffs' allegations revolve around the business of factoring, a form of commercial finance by which credit institutions provide financing to clients in exchange for the right to collect the client's accounts receivable. These credit institutions, commonly referred to as factors, advance up to 80% of the worth of a garment manufacturers' invoices in exchange for fees and interest. Complaint at 8, ¶ 20. The factor also assumes the risk of collecting the client garment manufacturers' accounts receivable. *Id.* A factor assumes that credit risk, however, only after it has checked whether its client garment manufacturer is selling to a creditworthy purchaser. The garment manufacturer, in turn, uses that credit to purchase raw materials to produce their product. *Id.*

Plaintiffs allege that the defendants mutually agreed to stop credit-checking plaintiff garment manufacturers, denied them credit and/or withdrew their funding. The refusal by a factor to credit check a garment manufacturer results in "the garment manufacturer [being] unable to obtain virtually any fabric or other raw materials on credit." *Id.* at 10, ¶ 24. Specifically, plaintiffs allege that Westgate Financial Corp. and Finova Capital, Inc. allegedly discontinued their funding of plaintiff John Michaels, Inc. *Id.* at 4, ¶ 11. Finova Capital, Inc. also allegedly denied credit to John Michaels, Inc. *Id.* at 5, ¶ 12. Defendants Rosenthal & Rosenthal ("Rosenthal") and Star Funding, Inc. are alleged to have withdrawn funding from plaintiff Gabbey Design, Group, Inc. *Id.* at 3, 5, 6 ¶¶ 6, 13, 16. Defendant Omni Commercial denied credit and refused to release monies to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. as well. *Id.* at 3, 5, ¶¶ 7, 14. The plaintiffs also allege that defendant Access Capital "published false accusations against plaintiffs, which caused plaintiffs to be group boycotted by defendants." *Id.* at 3, ¶ 7. Plaintiffs further claim that "Access Capital designed and orchestrated the group boycott of plaintiffs and caused defendants to deny credit ... and caused plaintiffs to cease operations." *Id.* at 4, ¶ 10. Individual defendants Miles M. Stuchin and Richard I. Simon are alleged to be the presidents of Access Capital, Inc. and Westgate Financial Corp., respectively. *Id.* at 6, ¶ 17. Each are alleged to have "conspired with other defendants to conduct a group boycott against plaintiffs." *Id.* at 6-7 ¶¶ 17-18.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

**\*2** Plaintiffs assert that defendants' actions precluded them from receiving the credit that they needed to purchase fabric or other raw materials. This, in turn, caused some of them to lose money and "to cease operations." Complaint at 2-4, ¶¶ 4-10.[1] Without specifically identifying which defendants were involved and which plaintiffs were affected, plaintiffs allege that the "factoring defendants, engaged in boycotting certain plaintiffs, denied credit to certain plaintiffs, fixed costs and interest rates, published letters to plaintiffs' customers, and agreed with other factors to fund certain manufacturers and to deny funding to other manufacturers, and to drive them out of business." *Id.* at 11, ¶ 25. Plaintiffs claim that the defendants communicated with each other, shared credit information, and agreed to make credit decisions together. Complaint at 12, ¶ 30. These communications allegedly occurred during meetings of the Uptown Credit Group and the Thursday Group.[2] Plaintiffs maintain that these groups "allowed defendants to conduct their secret meetings and made many of their collective credit decisions at these meetings and during telephone calls and other contacts." *Id.* at 12, ¶ 28. Plaintiffs argue that the defendants' denial of credit constitutes a group boycott in violation of Section 1 of the Sherman Act. In addition, plaintiffs allege that the defendants "controlled the price and interest rates for factoring" constituting illegal price-fixing in violation of Section 1 of the Sherman Act. *Id.* at 18, ¶ 57. Plaintiffs also claim that defendants' actions constitute illegal price-fixing in the "piece goods" market, arguing that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors."[3] *Id.* at 8, ¶ 20.

[1] Without specifically identifying which manufacturers, plaintiffs allege that "numerous garment manufacturers have been driven out of business." Plaintiffs' complaint, however, is devoid of any allegation that any of the plaintiffs have gone out of business. To the contrary, plaintiffs complaint alleges that each corporate plaintiff "was and still is a domestic Corporation duly organized and licensed to do business within the State of New York." Complaint at 2-3, ¶¶ 4-7.

[2] Uptown Credit Group and the Thursday Group are not parties to this litigation.

[3] The piece goods market is the market for raw materials such as fabric, buttons, trim and other accessories.

Plaintiffs also claim that the defendants violated Section 2 of the Sherman Act by engaging "in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, ¶ 30. Plaintiffs allege that the defendants acted as "one," in that defendants "black listed certain customers and weeded out those that they targeted to drive out of business." *Id.* at 11, ¶ 27 (internal quotations omitted). Plaintiffs assert that through these actions, the defendants "have engaged in predatory and anti-competitive conduct, with a specific intent to monopolize, and have achieved monopoly power." *Id.* at 17, ¶ 53. This conspiracy to monopolize allegedly occurred in two markets: the factoring market for domestic garment manufacturers and the piece goods market. Plaintiffs claim that the defendants "factor 90% of the factored piece goods vendors in the United States." *Id.* at 10, ¶ 24. Plaintiffs also allege that all the defendants are members of the Uptown Credit Group and the Thursday Group, which plaintiffs maintain are designed "to maintain a monopoly over the industry, and they collectively agreed unlawfully to deny plaintiffs credit." *Id.* at 9, ¶ 22. Plaintiffs allege that "[c]ollectively, defendants involved in these two groups control over 85% of [the] factoring market for garment manufacturing and virtually all of the piece goods manufacturing segment of that market." *Id.*[4]

[4] Plaintiffs also assert claims under the Clayton Act § 4, the Donnelly Act of the State of New York, as well as the following common law claims: trade libel, defamation, injurious falsehood, interference with commercial relations, and breach of contract.

**\*3** Defendants submitted motions to dismiss plaintiffs' claims, arguing that the plaintiffs failed to allege a violation of Section 1 of the Sherman Act. Specifically, defendants argue that plaintiffs failed to make sufficient allegations to establish that: the defendants entered into an agreement to boycott; the defendants engaged in price-fixing; and the defendants caused plaintiffs to suffer an antitrust injury rather than an injury specific to plaintiffs. Defendants also maintain that plaintiffs have failed to sufficiently allege a violation of Section 2 of the Sherman Act, arguing that plaintiffs' complaint fails to allege: a conspiracy by defendants to monopolize the market; an abuse of power by defendants; an antitrust injury; and a relevant market.[5] Defendants further argue that plaintiffs have failed to state a claim under the Section 4 of the Clayton Act, the Donnelly Act, or other state laws.

[5] Defendants C.I.T. Group and Rosenthal & Rosenthal submitted a brief in support of their motion to dismiss. Their arguments to dismiss plaintiff's federal claims were adopted by Westgate Financial Corp., Richard I. Simon, and Omni Commercial. In lieu of filing a

motion, defendants Star Funding, Inc. and UCC Asset Management submitted a letter dated March 12, 2002 stating that "counsel for plaintiff and [these defendants] have agreed that to the extent that portion of the decision of the Court regarding the federal claims (and the Donnelly Act claim) applies to all Moving Defendants, it shall also be deemed to apply to Star and UCC." Similarly, defendants Access Capital, Inc. and Miles M. Stuchin, in a letter dated February 7, 2002, informed the Court that "[i]n lieu of filing a formal motion to dismiss the plaintiffs' complaint, [defendants] submit this letter to join and adopt the legal arguments made by counsel for [Finova], [C.I.T.], [Rosenthal & Rosenthal], [Omni], [Westgate], and [Simon] in connection with their respective motions to dismiss."

## II. *Discussion*

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint where the complaint "fail[s] ... to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. *See Patel v. Searles,* 305 F.3d 130, 134-35 (2d Cir.2002). A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992). In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991); *see also Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 71 (2d Cir.1998)(in evaluating motions to dismiss, a court must limit its review to the allegations contained within the four corner's of the complaint).

Although no heightened pleading requirements apply in antitrust cases, *Todd v. Exxon Corporation,* 275 F.3d 191, 198 (2d Cir.2001), a plaintiff must do more than cite relevant antitrust language to state a claim for relief. *See TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1024 (10th Cir.1992). "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." *Id.* (citing *Klebanow v. new York Produce Exch.,* 344 F.2d 294, 299 (2d Cir.1965)). Furthermore, "[i]t is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants

have violated the antitrust laws in ways that have not been" set forth in the complaint. *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F .3d 136, 139 (2d Cir.1998). The complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Fort Wayne Telsat v. Entertainment and Sports Programming Network,* 753 F.Supp 109, 111 (S.D.N.Y.1990). "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.* (quoting *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1081-82 (D.C.Cir.1984)).

### A. *Section 1 of the Sherman Act*

 **\*4** Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. This blanket prohibition against any restraint of trade has been delineated into two separate doctrines. The first doctrine finds certain conduct illegal *per se* .

In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so plainly anticompetitive, and so often lack any redeeming virtue, that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases.

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 7-8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979)(internal quotations and citations omitted). Examples of *per se* illegal conduct include horizontal restraints, i.e. agreements between competitors at the same level of market structure, like agreements to fix prices and group boycotts. *See, Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)(finding group boycotts unreasonable *per se* ); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)(finding price fixing unreasonable *per se* ); *Michelman v. Clark-Schwebel Fiber Glass Corporation,* 534 F.2d 1036, 1043 (2d Cir.1976)(finding that a group boycott, because of its inherently anti-competitive nature, is unreasonable *per se* and thus always illegal).

Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact, and a

judgment with respect to its reasonableness is made. *See* Kaye Scholer, Kaye Scholer's Antitrust Deskbook, 6 (3d ed.2002). For example, allegations of agreements between entities at different market levels that restrain trade i.e., vertical agreements, are analyzed under the rule of reason. *Electronics Communications Corp. v. Toshiba America Consumer Prods. Inc.,* 129 F.3d 240, 243 (2d Cir.1997)("Absent price-fixing between a supplier and distributor, vertical restraints are generally subject to 'rule of reason' analysis.") *Id.*

a. Per se *Illegal Conduct: Group Boycott and Price Fixing* Plaintiffs allege that the defendants violated Section 1 of the Sherman Act "by engaging in an unlawful group boycott and a concomitant price-fixing conspiracy" in which the defendants collectively refused to credit check certain garment manufacturers. Complaint at 18, ¶ 56. Plaintiffs further claim that defendants colluded to fix the price and interest rates for factoring as well as the price of the piece goods purchased by the garment manufacturers.

**\*5** Defendants argue that plaintiffs' complaint alleges no facts to support a finding that an agreement or conspiracy to boycott existed and that plaintiffs' complaint "alleges only the naked conclusion that the defendants conspired and agreed. No specific agreement is alleged with any factual particularity-no dates, no details, no places, no participants, no purpose, no decisions, no terms, no actions." Defendant C.I.T.'s Memorandum of Law in Support of Its Motions to Dismiss the Complaint ("C.I.T.Brief") at 7. Defendants also argue that the plaintiffs have failed to state a claim to establish price fixing in either the factoring market or the piece goods market.

i. *Group Boycott*
Courts have found that group boycotts, because of their anti-competitive nature, are unreasonable *per se* and therefore always illegal. *See Klor's, Inc.,* 359 U.S. at 212; *Michelman v. Clark-Schwebel Fiber Glass Corporation,* 534 F.2d at 1043. Plaintiffs allege that the defendants conspired to conduct a group boycott against plaintiffs by denying them credit. Defendants routinely communicated with each other, had access to each others' databases and credit information, consulted with each other regarding credit decision, shared confidential information, and agreed together when making credit decisions concerning garment manufacturers.

Complaint at 12, ¶ 30. Plaintiffs, however, fail to provide sufficient factual allegations to support this claim. There is

no allegation that a particular plaintiff, once refused to be credit checked by one factor, was subsequently refused by each of the other factors. *Compare Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc. and The Uptown Credit Group, Inc.,* 2002 WL 31164482, * 9 (S.D.N.Y.2002)(in finding that plaintiff stated a claim for group boycott, the Court found that "the gravamen of plaintiff's amended complaint is that C.I.T. and the other factors agreed that once C.I.T. refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well"). *Id.* There is no allegation that a particular garment manufacturer applied for and was refused to be credit checked by all of the defendants.

Conversely, there is no allegation that a particular factor refused to credit check all of the plaintiffs. Plaintiffs' complaint specifically alleges that specific defendants denied credit to specific plaintiffs, withheld from a specific plaintiff credit or refused to release to a specific plaintiff monies allegedly owed. Complaint at 3-7, ¶¶ 6-18. Plaintiffs allege that "after a group meeting of defendants," defendants Westgate Financial Corp. and Finova Capital, Inc. refused to continue funding plaintiff John Michaels and that Finova Capital, Inc. denied credit to John Michaels, Inc. *Id.* at 4, 5 ¶¶ 11-12. "[A]fter a group meeting of defendants," defendants Rosenthal & Rosenthal and Star Funding, Inc. are alleged to have withdrawn funding to plaintiff Gabbey Design. *Id.* at 3, 5, 6 ¶¶ 6, 13, 16. "[A]fter a group meeting of defendants," defendant Omni Corp. is alleged to have refused to release monies to plaintiff Garment Makers, Inc. *Id.* at 3, ¶ 7. "[A]fter a group meeting of defendants," defendant Omni Commercial is alleged to have denied credit to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. There is, furthermore, no allegation that the plaintiffs are one organization, belong to the same association, or that they possess any contractual relationship. Lastly, plaintiffs allegation that defendants "used subjective criteria and denied credit based upon malice, ill will, a personal dislike of management, rumors with no bearing on the customer's creditworthiness, or simply due to negligence" belies their argument that a collective decision not to credit check certain plaintiffs was because of a conspiracy to boycott. Complaint at 10, ¶ 24. Rather, this allegation supports a finding that credit-checking decision were made independently by each factor based on subjective criteria.

**\*6** Plaintiffs' also argue that the defendants "engaged in group meetings" to share "credit information" and "had

2004 WL 2903776, 2005-1 Trade Cases P 74,693

access to each other's databases and credit information."
Complaint at 11-12, ¶¶ 27, 28, 30. Although "information
exchange" has been found to be an example of a facilitating
practice that a court could use to help support an inference
of a price-fixing agreement,[6] the exchange of information
between business firms concerning the credit-worthiness of
customers has long been held not to violate the Sherman Act."
*Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d
1036, 1048 (2d Cir.1976); *see also Cement Mfrs. Protective
Ass'n v. United States,* 268 U.S. 588, 604, 45 S.Ct. 586, 591
(1925).[7] Furthermore, "the dissemination to competitors of
information concerning the credit-worthiness of customers
aids sellers in gaining information necessary to protect
themselves against fraudulent or insolvent customers."
*Michelman,* 534 F.2d at 1048. Lastly, the Second Circuit has
held that "it is not a violation of Section 1 to exchange such
information, provided that any action taken in reliance upon
it is the result of each firm's independent judgment, and not
of agreement ." *Id.*

[6]    *See Todd v. Exxon Corporation,* 275 F.3d 191, 198 (2d
       Cir.2001).

[7]    Although the Supreme Court has found that the exchange
       of information itself, as opposed to merely using the
       information exchanged as evidence upon which to infer
       a price-fixing agreement, violates Section 1 of the
       Sherman Act under a Rule of Reason analysis, plaintiffs
       in the present case have made no such argument and
       therefore, this type of violation will not be entertained by
       the Court.

In the absence of factual allegations to support their claim,
plaintiffs' claim of group boycott is dismissed. *See Fort
Wayne Telsat v. Entertainment and Sports Programming
Network,* 753 F.Supp. at 115 (finding that local subscription
company had to do more than merely allege existence of a
conspiracy; company was required to prove factual basis for
the allegation); *see also Garshman v. Universal Resources
Holding Inc.,* 824 F.2d 223, 230 (3d Cir.1987)("The allegation
of unspecified contracts with unnamed other entities to
achieve unidentified anticompetitive effects does not meet the
minimum standards for pleading a conspiracy in violation of
the Sherman Act." *Id.*); *Heart Disease Research Foundation
v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972)("a
bare bones statement of conspiracy or of injury under
the antitrust laws without any supporting facts permits
dismissal"). *Id.*

ii. *Price Fixing*

Plaintiffs' claim of price fixing is equally conclusory.
Plaintiffs allege that the defendants "have dominated the
factoring market for domestic garment manufacturers for
many years [and] used their control over [the] market to
fix conditions," specifically by controlling "the price and
interest rates for factoring." *Id.* at 18, ¶¶ 56-57. Plaintiffs
allege that by colluding and agreeing to drive their own clients
out of business, the defendant factors have "enhance[d] their
overall competitive position and [reduced] [their] collective
credit risk exposure." *Id.* at 18, ¶ 57. Defendants argue
that "[p]laintiffs do not allege, even in conclusory fashion,
that defendants fixed the price of the product they provide:
factoring and financial serves. There is no allegation that the
price, terms, conditions, interest rates or any other aspect of
defendants' factoring services were fixed." C.I.T. Brief at 11.

**\*7** Similar to plaintiffs' arguments in *Dresses for Less, Inc.*
2002 WL 31164482, plaintiffs' in the present case argue
that the factor's denial of credit is analogous to the facts
of *Catalano v. Target Sales, Inc.* 446 U.S. 643, 100 S.Ct.
1925, 64 L.Ed.2d 580 (1980). In *Catalano,* competing beer
wholesalers agreed to fix the credit terms on which they
would sell beer to retailers. Specifically, the wholesalers
agreed to require that the retailers pay in advance or upon
delivery, and to discontinue the practice of accepting late
payments without interest. *Id.* at 644-45. The Court held
that "credit terms must be characterized as an inseparable
part of price. An agreement to terminate the practice of
giving credit is thus tantamount to an agreement to eliminate
discounts, and thus falls squarely within the traditional *per
se* rule against price fixing." *Id.* at 648. Unlike *Catalano,*
however, the present complaint alleges that the defendants
specifically denied credit to the plaintiffs alone and not to all
of their customers. Most importantly, there is no allegation
that the defendants conspired or agreed to fix the price or
terms of credit. Plaintiffs' price fixing argument hinges on
the allegation that by not extending credit to the plaintiffs,
the defendants "minimized their risks and costs of doing
business" thereby controlling the price and interest rates
for factoring. Complaint at 18, ¶ 57. Plaintiffs, however,
do not state how the denial of credit to specific garment
manufacturers affected market prices. *Dresses for Less, Inc.*
2002 WL 31164482 at \*10. Plaintiffs' claims of price fixing in
the factoring industry are completely conclusory, unsupported
by factual allegations and are, therefore, dismissed.

Furthermore, plaintiffs appear to allege that defendants have
also fixed the prices in the piece goods market. Plaintiffs argue

that "when defendants conspire to withdraw funding, they are actually fixing the prices of the goods." Plaintiffs' Brief at 18. Plaintiffs apparent argument is that piece goods cost more to the plaintiffs as a result of defendants denial of credit. This allegation is insufficient to find that the defendants conspired or agreed to fix prices in the piece goods market. Plaintiffs claim that defendants fixed prices in the piece goods market, therefore, is also dismissed.

b. *The Rule of Reason*

In alleging a violation of Section 1 of the Sherman Act under the rule of reason, a plaintiff bears the burden of showing that the challenged action has an actual adverse effect on competition as a whole in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.1993). It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate "an actual adverse effect on competition market-wide." *Electronics Communications Corp., v. Toshiba,* 129 F.3d at 244. "The injury to a relevant market requirement assures that the Sherman Act protected competition as a whole in the relevant market, and not the individual competitors within that market." *Dresses for Less, Inc.* 2002 WL 31164482 *7(S.D.N.Y.2002)(internal quotations omitted).

**\*8** In support of their rule of reason claim, plaintiffs allege that

[e]ach of the agreements entered into among the defendants was an agreement in restraint of trade in violation of 15 U.S.C. § 1, intending to achieve anti competitive effects. Each agreement violates the Sherman Act under the Rule of Reason because its pro-competitive effects are outweighed by its anti-competitive effects.

Complaint at 19, ¶ 65. Plaintiffs also claim that "[a]s a result of defendants' conduct, plaintiffs have been damaged in an amount to be determined at trial in excess of $40,000,000.00 for which defendants are jointly liable." *Id.* at 19, ¶ 66. Plaintiffs also allege that the

piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace.

*Id.* at 8, ¶ 20.

These allegations are insufficient to establish a violation under the rule of reason. Plaintiffs make no allegations from which the Court could infer that defendants' alleged actions had "any anticompetitive effect beyond the injury to plaintiffs." *See Granite Partners. L.P v. Bear, Stearns & Co., Inc.* 17 F.Supp.2d 275, 297-98 (S.D.N.Y.1998). As discussed *supra,* plaintiffs have not articulated with any particularity the effect of the defendants' alleged actions on the piece goods market. Alleging that the price they paid for piece goods increased as a result of their concomitant inability to receive credit to purchase those goods falls short of alleging an anticompetitive effect beyond personal injury to the plaintiffs. Furthermore, the allegation that client competition among the factors was reduced is conclusory and unsubstantiated. Lastly, plaintiffs' allegation of an anticompetitive effect on the domestic garment manufacturing marker is also conclusory. Plaintiffs claim that garment manufacturers were eliminated from the marketplace. However, they do not allege what garment manufacturers, other than themselves, were affected by defendants' alleged actions. Indeed, plaintiffs' claims center on their injury alone and not on a broader injury to competition generally. Plaintiffs, therefore, have also failed to allege the requisite antitrust injury to competition resulting from defendants' actions.

A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. *Dresses for Less,* 2002 WL 31164482 at \* 7 (S.D.N.Y.2002). Market power is defined as the power to raise prices significantly above the competitive level without losing all of one's business. *See id.; see also CDC Technologies,* 186 F.3d 74, 81 (2d Cir.1999)(internal citations and quotations omitted). Plaintiffs do not allege with any specificity that defendants possess market power in the factoring market. Plaintiffs, furthermore, do not allege that the defendants sought to raise the price for credit market-wide in a manner that affected competition. Plaintiffs' Second Cause of Action alleging a violation under the Rule of Reason is therefore dismissed.

B. *Section 2 of the Sherman Act*

**\*9** Plaintiffs claim that the defendants have conspired to monopolize both the factoring market for domestic piece goods vendors and the factoring market for domestic garment manufacturers.[8] They allege that the defendants "engaged in an unlawful combination and conspiracy to unreasonably

restrain and monopolize interstate commerce." Complaint at 12, ¶ 30. Plaintiffs assert that the "[d]efendants acted as "one" and that they "black listed certain customers and weeded out those that they targeted to drive out of business." *Id.* at 11, ¶ 27. Defendant C.I.T. argues that plaintiffs' complaint fails to allege a conspiracy to monopolize, an abuse of monopoly power, an antitrust injury or a relevant market.[9] Defendant Rosenthal similarly argues that plaintiffs have failed to allege an antitrust injury, an abuse of monopoly power or a relevant market.[10]

8    Although plaintiffs did not specify in their complaint that their third cause of action constituted a conspiracy to monopolize claim as opposed to a monopolization claim, in their Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint ("Plaintiffs' Brief"), plaintiffs argue that their complaint alleges a conspiracy to monopolize. *See* Plaintiffs' Brief at 20.

9    C.I.T. also asserts that they should not even be a defendant in this matter as they are not alleged to have had a factoring contract with the plaintiffs and were not a party to any of the alleged tortious conduct that C.I.T. claims is the gravamen of plaintiffs' complaint. C.I.T. argues that they are "named as a defendant solely because of [their] alleged market share and because [they] attended, along with other factors, weekly meetings of two industry credit groups. That is not enough to state a claim under any law, including the antitrust laws." C.I.T. Brief at 1.

10    Rosenthal likewise argues that "CIT was added to the Complaint simply to permit a Section 2 claim to be asserted." Rosenthal Brief at 13.

Section 2 of the Sherman Act provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several States" shall have committed an illegal act. 15 U.S.C. § 2. In order to state a claim of conspiracy to monopolize under Section 2, a plaintiff must allege (1) a concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 246 (2d Cir.1997). "Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one." *Id.* Furthermore, "a short plain statement of a claim for relied which gives notice to the

opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George C. Frey Ready-Mixed Concrete, inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977). Lastly, "[i]n antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998)(internal quotations and citations omitted).

Plaintiffs' complaint presents colorable claims of a conspiracy to monopolize under Section 2. The gravamen of plaintiffs' Section 2 claims, and indeed of all of plaintiffs' federal claims, is that the defendants conspired to selectively choose which garment manufacturers would receive credit and which would not. This choice, in effect, ultimately decided which manufacturers went out of business and which ones did not. Complaint at 20, ¶ 68. Whether through the defendants' alleged membership in both the Uptown Credit Group and the Thursday Group, or through other unspecified meetings, plaintiffs maintain that the defendants "shared all credit information and in effect merged the companies." *Id.* at 11, ¶ 27. It is at these meetings and "during telephone calls and other contacts" that the alleged concerted action took place. *Id.* at 12, ¶ 28.

 **\*10** Similar to their arguments to dismiss plaintiffs' Section 1 claims, defendants contend that the plaintiffs have failed to specify the conspiracy claims with any particularity, citing several cases where antitrust conspiracy actions were dismissed for failing to allege any supporting facts. *See Telectronics Proprietary. Ltd., v. Medtronic, Inc.,* 687 F.Supp 832, 839 (S.D.N.Y.1988)(quoting *Heart Disease Research Foundation v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972)).[11] Unlike their Section 1 claim, however, plaintiffs have alleged facts sufficient to support a preliminary finding of concerted action among the defendants.[12]

11    Unlike the plaintiff in *Telectronics,* who did not name the others who allegedly conspired with the defendants, plaintiffs in the instant case have alleged that all the defendants conspired with each other to monopolize the factoring markets for garment manufacturers and for piece goods vendors.

12    Sections 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other, although the objects of the conspiracies may partially overlap. *See American*

*Tobacco Co. v. United States,* 328 U.S. 781, 788, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946).

Plaintiffs, furthermore, allege several overt acts in furtherance of the alleged conspiracy. Plaintiffs claim that the defendants deliberately created a monopoly by merging their interests, eliminating competition, and working to together control the business, by agreeing and deciding to give Plaintiffs credit or not, setting the prices, controlling every credit decision relative to factored sales, issuing substantially the same unconscionable contract, and having the ability to drive manufacturers out of business, including plaintiffs.

Complaint at 13, ¶ 33. Plaintiffs further allege that the defendants

have the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers by choosing which manufacturers they would withhold payments to and deny credit to, fixing costs of goods at artificially high prices, and charging exorbitant fees.

Complaint at 9, ¶ 21. These allegations are sufficient to allege overt acts in furtherance of the conspiracy.

Plaintiffs have also specifically alleged the defendants' intent to monopolize. Plaintiffs claim that the defendants "engaged in the acts and practice alleged herein with the specific intent to achieve or maintain monopoly power in the two affected markets." Complaint at 20, ¶ 69. Plaintiffs further allege that the defendants' merging of interests gave the defendants "a dominant share in the factored domestic manufacturing market" and in the piece goods market, as well as "the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers." *Id.* at 9, ¶ 21. This alleged monopoly power came from the defendants' ability to "control 85% of factoring market for garment manufacturing" and "90% of the factored piece goods vendors in the United States." *Id.* at 9, 10 ¶¶ 22, 24. Although the allegation of market share is not the same as one alleging monopoly power, the existence of monopoly power may be inferred from a predominant share of the market. *See United States v. Grinnel Cop.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966). The higher the market share, the stronger the inference of monopoly power. *See Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.,* 651 F.2d 122, 129 (2d Cir.1981).

**\*11** Defendants further argue that plaintiffs' fail to allege an anticompetitive effect harmful to competition or antitrust injury. "Market share is not enough to allege a violation of Section 2 because monopoly power is not unlawful *per se.*" Defendant C.I.T. Brief at 14 (internal quotations and citations omitted). An "antitrust injury" is an

injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Mr. Furniture Warehouse, Inc. v. Barclays American/Commerical Inc.,* 919 F.2d 1517, 1522 (11th Cir.1990)(finding that a "monopolist's refusal to deal becomes actionable under the antitrust laws only where the refusal is designed to have an anticompetitive effect, whether to gain greater market share, to drive up prices, or to obtain some other illegal goal"). To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging,* 996 F.2d at 543; *see also Brunswick Corp.,* 429 U.S. at 488 ("The antitrust laws ... were enacted for 'the protection of competition, not competitors .' ")(quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Plaintiffs, however, have proffered sufficient allegations displaying harm to competition and antitrust injury. Plaintiffs allege that [d]efendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, because they have acted with specific intent to archive (sic) or maintain monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers that potentially enhance defendants' overall credit risk exposure.

Complaint at 20, ¶ 70. Plaintiffs also maintain that the defendants'

actions have harmed consumers in that the manufacturer has to charge higher prices and the manufacturers that were forced out of business prevented consumers from having the freedom to choose from quality merchandise suppliers since there is a limited product.

Complaint at 16, ¶ 49. These allegations are sufficient to allege both the anticompetitive effect of, as well as the antitrust injury resulting from, defendants' actions.

Lastly, defendants argue that the plaintiffs have failed to adequately allege a relevant market. "A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* 2001 WL 1468168 (S.D.N.Y.2001). However, because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corporation,* 275 F.3d 191, 199 (2d Cir.2001). "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Id.* at 199 (internal citations omitted). "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Id.*

**\*12** Plaintiffs allege that the "relevant market is the factoring market for domestic garment manufacturers." Complaint at 8, ¶ 20. Plaintiffs further claim that factors are distinguishable from banks and other credit institutions in that factors are willing to grant credit without the borrower having to put up collateral outside of the borrower's invoices and incoming accounts receivable. *Id.* Plaintiffs also claim that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace." *Id.* Defendants' motions to dismiss plaintiffs' Section 2 claims are denied.

C. *Clayton Act*
Plaintiffs also assert claims under Sections 4 and 7 of the Clayton Act. Complaint at 1, ¶ 1.[13] Plaintiffs make the same allegation they did under their Section 1 and Section 2 claims alleging that the

13   The Fourth Cause of Action of plaintiffs' complaint does not specify which section of the Clayton Act was violated. In paragraph 1 of their complaint, plaintiffs allege a violation of Section 4. Section 4, however, does not provide a substantive claim for relief but rather enables plaintiffs who have been injured under the antitrust laws to sue for damages. *See Floors-N-More, Inc. v. Freight Liquidators,* 142 F.Supp.2d 496, 499-500 (S.D.N.Y.2001); *see also Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In contrast, plaintiffs argue in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss that they have adequately alleged a claim under Section 7 of the Clayton Act. Plaintiffs do not reference any other section of the Clayton Act. The Court, therefore, will construe plaintiffs' Clayton Act claim as one being under Section 4 and Section 7 of that act.

[d]efendants violated the Clayton Act because it has acted with specific intent to achieve or maintain its monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers to enhance defendants' overall credit risk exposure.

Complaint at 21, ¶ 76.

The Supreme Court summarized the purpose of Section 7 of the Clayton Act in *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 531-32, 93 S.Ct. 1096, 1099-1100, 35 L.Ed.2d 475 (1973): Section 7 of the Clayton Act forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly.[14] The section proscribes many mergers between competitors in a market, *United States v. Continental Can Co.,* 378 U.S. 441 (84 S.Ct. 1738, 12 L.Ed.2d 953) (1964); *Brown Shoe Co. v. United States,* 370 U.S. 294 (82 S.Ct. 1502, 8 L.Ed.2d 510) (1962); it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 578-580 (87 S.Ct. 1224, 1230-1231, 18 L .Ed.2d 303) (1967). Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired

company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. *Id.,* at 580-581 (87 S.Ct. at 1231-1232); *United States v. Penn-Olin Chemical Co.,* 378 U.S. 158, 173-174 (84 S.Ct. 1710-1718, 12 L.Ed.2d 775) (1964).

14      Section 7 of the Clayton Act provides that

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. 15 U.S.C. § 18.

**\*13** None of the preceding situations exist in the present case. Plaintiffs allegations of a 'merger' are conclusory and unsupported by any factual allegations. Plaintiffs do not allege the existence of either a merger agreement or an acquisition agreement to support its Section 7 claim. Plaintiffs' Section 7 claim, therefore, is dismissed.

### D. *Donnelly Act*

Plaintiffs also assert claims under the Donnelly Act of the State of New York. Specifically, plaintiffs allege that the defendants

entered into agreements with other factoring companies to engage in group boycotts where they refused to approve credits for New York based garment manufacturers, unlawfully fixed piece goods prices for those manufacturers, drove them out of business, and enabled the factors to maintain supra-competitive pricing structures and stable market shares, among other anticompetitive effects.

Complaint at 22, ¶ 79. Plaintiffs further assert that

[t]he unlawful reduction of the number of garment manufacturers competing in the market has resulted in artificially maintained and non-competitive levels of prices for factoring services throughout New York and has enabled the factors to stabilize their respective market shares in a way that could not have been achieved or maintained had the factors operated in a genuinely competitive environment.

Complaint at 22, ¶ 80. Defendants move to dismiss plaintiffs' Donnelly Act claims on the same grounds that it moved to dismiss the Sherman Act claims.

The Donnelly Act, N.Y. Gen. Bus. Law § 340, states that "[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. N.Y. Gen. Bus. Law § 340(1). The Donnelly Act was patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act. *See State v. Mobil Oil Corp.,* 38 N.Y .2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976); *accord Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton,* 997 F.Supp. 340 (E.D.N.Y.1998) (finding Donnelly Act is modeled after the Sherman Antitrust Act and is generally interpreted in accordance with federal precedent); *see also Anheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988) (Donnelly Act was modeled on the Sherman Act and is to be construed in accord with it). Accordingly, defendants' motion to dismiss plaintiffs' Donnelly Act claims is granted in part and denied in part. Plaintiffs' Donnelly Act claims of price-fixing and group boycott are therefore dismissed.

### E. *State Law Claims*

In addition to plaintiffs' federal and state antitrust claims, plaintiffs also allege the following pendant state law claims: trade libel; defamation, libel and slander; injurious falsehood; interference with commercial relations; and breach of contract. Each of these claims, with the exception of plaintiffs' breach of contract claim, have been alleged as conspiracies to commit the alleged tortious acts. In presenting their claims in this manner, plaintiffs allege that all of the defendants are liable for the tortious conduct. Specifically, plaintiffs' Sixth, Seventh, Eighth and Ninth Causes of Action claim that all of the defendants "engaged in an unlawful combination and conspiracy" to commit trade libel; defamation, libel and slander; injurious falsehood; and interference with commercial relations.

**\*14** Under New York law, however, "a mere conspiracy to commit a [tort] is never of itself a cause of action." *Alexander & Alexander v. Fritzen,* 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986) (citations omitted). An independent tort must form the basis of a claim of civil conspiracy. *See Demalco v. Feltner,* 588 F.Supp. 1277, 1278 (S.D.N.Y.1984); *Smukler v. 12 Lofts Realty,* 156 A.D.2d 161, 548 N.Y.S.2d 437, 439 (1st Dep't 1989), app. den., 76 N.Y.2d 701, 557 N.Y.S.2d 878, 557 N.E.2d 114 (1990). "[A] defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner." *Arlinghaus v.*

*Ritenour*, 622 F.2d 629, 639 (2d Cir.1980)(internal citations omitted); *see Banque Nationale de Paris v. Prudential Sec., Inc.,* 1997 WL 639257, at *3 (S.D.N.Y. Oct. 16, 1997). The purpose of civil conspiracy is to "establish[ ] joint liability by co-participants in a particular tortious conduct." *Sackman v. Liggett Group, Inc.,* 965 F.Supp. 391, 395 (E.D.N.Y.1997). A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: " '( [1] ) a corrupt agreement between two or more persons [;] ( [2] ) an overt act in furtherance of the agreement[;] ( [3] ) the parties' intentional participation in the furtherance of a plan or purpose [;] and ( [4] ) the resulting damage or injury." ' *Andre Emmerich Gallery, Inc. v. Segre,* 1997 WL 672009, at *10 (S.D.N.Y. Oct. 29, 1997) (quoting *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1267 (S.D.N.Y.1991)).

Plaintiffs provide no factual support for their conclusory allegations of a conspiracy to commit any of these torts. Plaintiffs claims of a conspiracy to commit these torts, therefore, is dismissed as to all plaintiffs. Furthermore, as will be seen, plaintiffs have also failed to allege facts sufficient to support their claims of the underlying torts.

a. *Trade Libel and Injurious Falsehood*
Plaintiffs Sixth and Eighth Causes of Action allege independent trade libel and injurious falsehood claims against all the defendants. In support of their trade libel claim, plaintiffs allege that the
[d]efendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such as plaintiffs' actions are fraudulent, their products and services are of inferior quality, they misappropriated inventories and are poor risks. Such publications being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods constituted, and continue to constitute, the tort of trade libel for which defendants are jointly and severally liable.

Complaint at 23, ¶ 87.

Similarly, in support of their injurious falsehood claim, plaintiffs restate many of the same conclusory allegations in their trade libel claim. Plaintiffs maintain that the
**\*15** [d]efendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths

disparaging plaintiffs, such publication being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods such as plaintiffs committed fraud, stole money, fraudulently conveyed assets, misrepresented themselves, and lied to their customers, and switched receivables constitute the tort of injurious falsehood. Defendants made these statements and published these statements knowing they were false and knowing and intending to cause harm to plaintiffs. These statements in fact caused harm to plaintiffs' in that plaintiffs' customers stopped doing business with plaintiffs and other factors withdrew funding from plaintiffs and factors refuse to factor plaintiffs.

Complaint at 25, ¶ 92.

These conclusory allegations are insufficient to support plaintiffs' claim of trade libel or injurious falsehood. The allegations fail to identify which specific defendants committed these torts. Furthermore, the allegations fail to identify the false statements made by any defendant. However, in their Seventh Cause of Action for defamation, slander and libel, plaintiffs make allegations from which the Court may infer false statements in support of their trade libel and injurious falsehood claims. Plaintiffs allege that Miles M. Stuchin "defamed and slandered Plaintiffs by writing and publishing false and libelous letters, including a letter dated November 3, 2000, and telephone calls, mainly during October 2000 and through and including December 2000, and oral communications to Plaintiffs' clients and to the industry." Complaint at 6, ¶ 17. Stuchin and defendant Access Capital, of which he is president, are alleged to have

defamed[,] libeled and slandered plaintiffs in that on many dates during the time between October 2000 and February 2001, defendant and his employees including Vincent Grillo called and wrote plaintiffs' customers and others in the industry stating that plaintiffs "committed fraud," "stole money," "fraudulently conveyed assets," "misrepresented themselves" and "lied" to their customers, and "switched receivables.

Complaint at 6, ¶ 17. Lastly, plaintiffs maintain that in a letter dated January 16, 2001, defendants Richard I. Simon and Westgate Financial, of which he is allegedly president, "accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey." Complaint at 7, 15, ¶¶ 18, 43. These statements were

published to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others. *Id.* at 15, ¶ 43.[15]

15     Plaintiffs have not pled their trade libel or injurious falsehood claim against all defendants with any specificity. The only defendants identified as having made false statements are Miles M. Stuchin, Access Capital, Richard I. Simon and Westgate Financial. The Court will therefore treat plaintiffs' claims of trade libel and injurious falsehood as against those defendants only. If indeed plaintiffs intended to allege these claims against all of the defendants, those claims are dismissed as conclusory and unsupported by specific allegations of published false statements.

Although pled separately, the torts of trade libel and injurious falsehood require the same allegations to be pled. The distinction between the two is slight; courts having articulated that statements disparaging another's product were called "trade libel," another's business "injurious falsehood," and another's title "slander of title." *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.,* 22 A.D.2d 595, 257 N.Y.S.2d 884, 887 (1st Dep't 1965). "The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Waste Distillation,* 136 A.D.2d 633, 634, 523 N.Y.S.2d 875 (2nd Dep't 1988); *see also Global Merch., Inc. v. Lombard & Co.,* 234 A.D.2d 98, 99, 650 N.Y.S.2d 724 (1st Dep't 1996) ("trade libel ... requires 'knowing publication of false matter derogatory to the plaintiff's business.' ") (quoting *Waste Distillation,* 136 A.D.2d at 634, 523 N.Y.S.2d 875). "The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow." *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.,* 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App. Div. 1st Dep't 1959).

**\*16** The elements of a claim of injurious falsehood or trade libel are: (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages. *See Drug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960); *see also Computech Int'l, Inc. v. Compaq Computer Corp.,* No. 02 Civ. 2628, 2002 WL 31398933, at \*5 (S.D.N.Y.Oct.24, 2002). The requirement of pleading and proving special damages is applied strictly. *See id.* at \*6. Thus, a motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity. *See id.; see also Drug Research Corp.,* 7 N.Y.2d at 440-41, 199 N.Y.S.2d at 37-38, 166 N.E.2d 319.

Plaintiffs' claims of trade libel and injurious falsehood, like their defamation, slander and libel claims, are premised on two letters dated November 3, 2000 and January 16, 2001 as well as telephone calls made during October 2000 and through and including December 2000. Plaintiffs complaint, however, does not allege with particularity to whom the November 3, 2000 letter was written.[16] Plaintiffs' claim regarding the November 3, 2000 letter, therefore, is dismissed. Furthermore, all of plaintiffs' trade libel and injurious falsehood claims against all defendants must be dismissed because plaintiffs failed to allege special damages with sufficient particularity. Under New York law, plaintiffs' special damages claim, premised on their loss of business, must be "fully and accurately stated." *Drug Research Corp. v. Curtis Pub. Co.,* 7, N.Y.2d 435, 440-41, 199 N.Y.S.2d 33, 37-38, 166 N.E.2d 319 (N.Y.1960)(finding that special damages were not adequately alleged where the damage claim was a round figure [$5,000,000] with no attempt at itemization); *see also Rall v. Hellman,* 284 A.D.2d 113, 114, 726 N.Y.S.2d 629, 632 (App. Div. 1st Dep't 2001)(finding that complaint was deficient because it failed to identify special damages with sufficient particularity). Plaintiffs allege damages "in an amount to be determined at trial but not less than $40,000,000.00." Complaint at 23, 26, ¶¶ 87, 93. This allegation is insufficient under New York law and cannot survive defendants' motion to dismiss.

16     Plaintiffs do, however, allege that "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance" Complaint at 15, ¶ 42. Plaintiffs also allege the third person to whom Westgate published false statements: "on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others." Complaint at 15, ¶ 43.

b. *Defamation, Libel, Slander*

In their Seventh Cause of Action, plaintiffs assert claims of defamation, libel and slander. Premised on the same set of allegations as their trade libel and injurious falsehood claims, plaintiffs' defamation, libel and slander claim is based on false statements allegedly made by defendants Stuchin, Access Capital, Simon and Westgate Financial in two letters dated November 3, 2000 and January 16, 2001, as well as oral statements made on the telephone from October 2000 through and including February 2001. Complaint at 6, 13, 14, 24, ¶¶ 17, 36, 37, 89. As with plaintiffs trade libel and injurious falsehood claims, plaintiffs' claim regarding the November 3, 2000 letter fails to specify to whom the letter was published and is, therefore, dismissed.

**\*17** Although defendants Westgate, Simon, Access and Stuchin argue that plaintiffs claim must be dismissed for failing to specify to whom all of the alleged defamatory statements were made, plaintiffs' complaint does allege that "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance." Complaint at 15, ¶ 42. Plaintiffs further assert

[t]hat on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others.

Complaint at 15, ¶ 43.[17]

[17]   Additionally, plaintiffs maintain that Omni Corp. "slandered plaintiffs to many in the industry." Complaint at 3, ¶ 7. Although plaintiffs allege that Omni Corp. and not named defendant Omni Commercial, LLP slandered the plaintiffs, assuming *arguendo* that the plaintiffs allegation is directed towards defendant Omni Commercial, plaintiffs' claim would still be dismissed for failure to state a claim. Plaintiffs do not allege a specific defamatory statement; to whom these statements were made; nor any special damages to support their claim.

Under New York law, the elements of a defamation cause of action are: (i) a defamatory statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant, (iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per se actionability (defamatory on its face). *See Dillon v. City of New York,* 261 A.D.2d

34, 37-38, 704 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1999); *Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 176 (2d Cir.2000). As a general rule, a statement is defamatory per se if it "tends to disparage a person in the way of his office, profession or trade." *Celle,* 209 F.3d at 179 (emphasis in original); *see also Aronson v. Wiersma,* 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 1008, 483 N.E.2d 1138 (1985). If a statement is defamatory *per se,* injury is assumed and the statement is actionable without proof of special damages. Special damages are those which flow directly from the injury to a plaintiff's reputation caused by the defamation and which involve the loss of something having economic or pecuniary value. *See Celle,* 209 F.3d at 179 (citing *Matherson v. Marchello,* 100 A.D.2d 233, 235, 473 N.Y.S.2d 998, 1000 (App. Div.2d Dep't 1984)). Lastly, "a plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication." *Celle* 209 F.3d at 178. If the statement is susceptible of only one meaning, it becomes the court's responsibility to determine, as a matter of law, whether that one meaning is defamatory. On the other hand, if the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it becomes the trier of fact's responsibility to determine in what sense the words were used and understood. *See id.*

Although plaintiffs allege that all of the defendants committed defamation, plaintiffs' complaint only supports claims against defendants Stuchin, Access Capital, Simon and Westgate Financial. Stuchin and Access Capital are alleged to be responsible for the November 3, 2000 letter as well as the oral communications between October 2000 and February 2001. Defendants Simon and Westgate are alleged to be responsible for the January 16, 2001 letter. As plaintiffs' complaint does not refer to any other communications, plaintiffs claims against all other defendants are dismissed.

**\*18** Plaintiffs' claims against defendants Stuchin and Access Capital regarding the November 3, 2000 letter are dismissed for failing to allege with specificity the exact words contained in the November 3, 2000 letter that plaintiffs' claim is libelous. Plaintiffs' insufficient pleading of the allegedly defamatory statement goes hand in hand with their failure to identify a plausible defamatory meaning for that statement. Plaintiffs further fail to allege to whom that letter was published. Lastly, plaintiffs fail to allege special damages or that the defamatory words contained in the letter should be considered by the Court as defamatory *per se. See Church of Scientology Int'l v. Eli Lilly & Co.,* 778 F.Supp 661, 668 (S.D.N.Y.1991)(dismissing claim that failed "to provide

both the context and the precise language of" the alleged statements).

Plaintiffs allegations concerning the January 16, 2001 letter allegedly written by defendants Simon and Westgate Financial suffer from the same deficiencies as their claims regarding the November 3, 2000 letter. Plaintiffs fail to articulate the libelous statement made in that letter and also fail to allege either special damages or that the libelous statement reaches *per se* liability. Although plaintiffs allege to whom that letter was sent, that allegation alone is insufficient to support plaintiffs' claims. Plaintiffs' libel claim regarding the January 16, 2001 letter is therefore dismissed.

Plaintiffs claims regarding telephone calls and other oral communications that occurred between October 2000 and February 2001 against Stuchin and Access Capital are dismissed except for one slander allegation: "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance." Complaint at 15, ¶ 42. Under New York law, there are four elements necessary to establish a *prima facie* case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. The fourth element is presumed when the defamatory statement takes the form of slander *per se. Weldy v. Piermont Airlines, Inc.,* 985 F.2d 57, 61-62 (2d Cir.1993) (citations omitted). Defamation *per se* "consist[s] of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein,* 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992). The second type of defamation *per se* is "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities". *Id.* Thus, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him". *Id.* at 436, 590 N.Y.S.2d 857, 605 N.E.2d 344 (citations omitted). For the purposes of this motion, therefore, plaintiff has adequately pled a *prima facie* case of slander. Defendants' motion to dismiss plaintiffs' claim of slander based on this telephone call is denied.

#### c. *Interference with Commercial Relations*

**\*19** In their Ninth Cause of Action, plaintiffs also allege a claim of interference with commercial relations. Plaintiffs maintain that the

[d]efendants have induced Plaintiffs' clients to refrain from purchasing from Plaintiffs by publishing disparaging and false statements about the products and services of Plaintiff, such publications being accompanied by an intent to cause competitive injury, personal hostility, bad faith, knowing the matter was false, by creating the impression and belief that to work with plaintiffs would jeopardize such customers' continued status, and by Defendants having purposely induced or otherwise caused third persons not to enter into or continue business relations with Plaintiffs.

Complaint at 13, ¶ 34. These allegations are insufficient to state a claim of tortious interference with business relations against all of the defendants. The only allegations which specify direct conduct by particular defendants are actions by defendants Access Capital and Stuchin against plaintiff John Michaels. Plaintiffs allege that Access Capital and Stuchin "interfered with an unrelated lawsuit plaintiffs were involved in, illegally diverted and opened plaintiffs' personal and business mail." Complaint at 6, ¶ 17. Plaintiffs assert that on or about and after October 27, 2000, Defendant Access intentionally and illegally diverted, opened and withheld Plaintiffs' mail, made illegal financial threats and demands upon Plaintiff John Michaels' accounts causing many of John Michael's accounts to withhold payments and caused John Michaels to be unable to operate its business.

Complaint at 14, ¶ 40. Plaintiffs maintain that

[d]efendants' actions constitute interference of John Michaels' and other plaintiffs' contractual relationships with its customer accounts, and disrupted the normal operation of John Michaels' and plaintiffs' business, causing a great loss of booked orders plus future sales. Defendants acted intentionally with the knowledge that their actions would cause John Michaels' accounts to stop payments for shipments received and that the factors would refuse to do business with plaintiffs, and that plaintiffs' customers would refuse to do business with plaintiffs.

Complaint at 15, ¶ 41.

In order to state a claim for tortious interference with contractual relations under New York law, a plaintiff must allege "(1) the existence of a valid contract between itself and

a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *150 East 58th St. Partners, L.P. v. Wilkhahn Wilkening & Hahn GmbH & Co.,* No. 97 CIV. 4262(SHS), 1998 WL 65992, at *1 (S.D.N.Y.Feb.17, 1998) (quoting *Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 77 (S.D.N.Y.1995)); *see Jews for Jesus, Inc. v. Jewish Community Relations Council of N.Y., Inc.,* 968 F.2d 286, 292 (2d Cir.1992); *Union Carbide Corp. v. Montell N.V.,* 944 F.Supp. 1119, 1136 (S.D.N.Y.1996); *Foster v. Churchill,* 87 N.Y.2d 744, 749-50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996).

**\*20** The standard for demonstrating tortious interference with business relations "is somewhat more stringent." *Campo v. 1st Nationwide Bank,* 857 F.Supp. 264, 273 (E.D.N.Y.1994); *see International Minerals and Resources, Inc. v. Pappas,* 761 F.Supp. 1068, 1075 (S.D.N.Y.1991). A plaintiff must allege that defendants interfered with business or economic relations between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by dishonest, unfair, or improper means. *See PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 269 (2d Cir.1987); *Fonar Corp. v. Magnetic Resonance Plus, Inc.,* 957 F.Supp. 477, 482 (S.D.N.Y.), cert. denied, 522 U.S. 908, 118 S.Ct. 265, 139 L.Ed.2d 191 (1997); *Houbigant, Inc. v. ACB Mercantile,* 914 F.Supp. 964, 995 (S.D.N.Y.1995); *Campo,* 857 F.Supp. at 273. Indeed, the defendant "must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Fonar Corp.,* 957 F.Supp. at 482.

Defendants Access and Stuchin argue that plaintiffs fail under both standards. First, defendants argue that plaintiffs fail to allege that they were "actually and wrongfully prevented from entering into or continuing in a specific business relationship." *Solar Travel Corp. v. Bachtomi,* 2001 WL 641151 (S.D.N.Y.2001); *Korn v. Princz,* 226 A.D.2d 278, 641 N.Y.S.2d 283 (1st Dep't 1996). Defendants further contend that plaintiffs have not alleged that a contract would have been entered into but for the alleged actions of Access and Stuchin. *See, e.g., Bankers Trust Co. v. Bernstein,* 169 A.D.2d 400, 563 N.Y.S.2d 821 (1st Dep't 1991).

Plaintiffs' claims against defendants Stuchin and Access Capital must be dismissed. Plaintiffs do not allege with any specificity the contracts it claims were breached or the business relations it claims were prevented from going

forward as a result of either Stuchin's or Access Capital's actions. Plaintiffs also fail to identify the third parties that plaintiffs had either a contractual or prospective business relationships with. Plaintiffs' claim of tortious interference with commercial relations is, therefore, dismissed.

### d. *Breach of Contract*

As is the case with all of their claims, in their breach of contract claim, plaintiffs do not specify which plaintiffs had contractual relationships with which defendants, generally alleging that the

[d]efendants conduct and the unlawful acts in restraint of trade have caused the breach of their respective contracts with plaintiffs, and, Defendants have breached their contractual duties to each plaintiff separately and apart from their anti-competitive conduct. Defendants also engaged in the following additional actions that further breached its covenants of good faith and fair dealing. Defendants' bad faith actions contributed substantially to the demise of the plaintiffs, and caused each of the plaintiffs' substantial financial loss. The contracts themselves are unconscionable, against public policy, and predatory.

**\*21** Complaint at 26-27, ¶ 98. Indeed the only allegations that support a breach of contract claim which specifically identify a breach by a particular defendant of a contract with a specific plaintiff are against defendants Westgate and Star Funding. Plaintiffs allege that

Westgate Financial confiscated Plaintiff John Michael's client inventory and sold it to a salvage company, never gave plaintiffs credit for payments made, refused to give advance funding, breached their contract, and caused a loss in excess of Two Million Dollars. Defendants misappropriated Plaintiffs' inventory and charged unlawfully high interest rates causing serious financial loss to John Michael's.

Complaint at 13, ¶ 35. Plaintiffs further allege that they were coerced and forced under duress to use the factor Star Funding, and then Star Funding immediately breached their contract based upon Rosenthal & Rosenthal's request not to go forward with its funding to Gabbey, all of this occurred after Star Funding and Rosenthal & Rosenthal met with defendants and agreed to force plaintiffs out of business.

Complaint at 14, ¶ 38.

In order to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of

**Kasada, Inc. v. Access Capital, Inc., Not Reported in F.Supp.2d (2004)**

2004 WL 2903776, 2005-1 Trade Cases P 74,693

the contract provisions by the defendants; and (4) damages resulting from the breach. *See Terwilliger v. Terwilliger,* 206 F.3d 240, 246 (2d Cir.2000). As plaintiffs have only alleged contracts with defendants Westgate and Star Funding, plaintiffs breach of contract claim against all other defendants are dismissed. Plaintiffs claims against these remaining defendants are also dismissed for failing to allege adequate performance of the contract by the plaintiffs as well as damages resulting from the breach.

III. *Conclusion*

Defendants' motions to dismiss plaintiffs' claims under Section 1 of the Sherman Act are granted. Defendants' motions to dismiss plaintiffs' claims under Section 2 of the Sherman Act are denied. Defendants' motions to dismiss plaintiffs' claims under the Clayton Act are granted.

Defendants' motions to dismiss plaintiffs' price-fixing and group boycott claims under the Donnelly Act are granted. Defendant's motion to dismiss plaintiffs' monopolization claims under the Donnelly Act are denied. Defendants' motions to dismiss all of plaintiffs' claims of trade libel, injurious falsehood, tortious interference with commercial relations and breach of contract are granted. Defendants' motion to dismiss plaintiffs' defamation, libel and slander claims is granted in part and denied in part. All of plaintiffs' defamation, libel and slander claims are dismissed except for plaintiffs' slander claim regarding the alleged December 5, 2000 telephone call.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2903776, 2005-1 Trade Cases P 74,693

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 3

Case 1:25-cv-05312-JGK    Document 17-1    Filed 08/08/25    Page 31 of 46

Midwest Railcar Corporation v. Everest Railcar Services, Inc., Not Reported in Fed....

2017 WL 1383765

2017 WL 1383765
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

MIDWEST RAILCAR
CORPORATION, Plaintiff,
v.
EVEREST RAILCAR SERVICES, INC.
and Steven J. Hendricks, Defendants.

16 Civ. 604 (AKH)
|
Signed 04/13/2017

**Attorneys and Law Firms**

Robert A. Calinoff, Calinoff & Katz, LLP, New York, NY, for Plaintiff.

Aaron Thomas Frazier, Harris Beach PLLC, Pittsford, NY, David M. Capriotti, Harris Beach PLLC, Syracuse, NY, James Raymond Muldoon, Harris Beach, PLLC, New York, NY, for Defendants.

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS**

ALVIN K. HELLERSTEIN, United States District Judge

*1 Plaintiff Midwest Railcar Corporation's ("Midwest") amended complaint, and Defendants Everest Railcar Services, Inc.'s and Steven J. Hendricks' (together, "Everest") counterclaims, allege contradictory positions regarding a series of railcar leases. Midwest has moved to dismiss Everest's counterclaims. *See* Dkt. No. 36. In order to rule on Midwest's motion, I must consider the merits of both the complaint and the counterclaims. In the context of this overall review, I first hold that Midwest has adequately stated a breach of contract claim for Everest's alleged repudiation of its prior exercise of an irrevocable option to either renew the leases or purchase the railcars. I dismiss, however, for lack of legal and factual sufficiency, Everest's counterclaims for breach of contract, conversion, unfair competition, tortious interference with contract, and tortious interference with prospective business relationship.

**FACTUAL BACKGROUND**

**I. The First Amended Complaint**

Midwest's First Amended Complaint ("FAC") complains that Everest breached a series of lease agreements for approximately 200 railcars and that Defendant Hendricks, Everest's president, breached his personal guaranty of Everest's performance. In 2011, Everest leased the railcars from Banc of America Leasing & Capital, LLC ("BofA Leasing") under a Master Lease Agreement and six schedules (the "Leases"), and Hendricks personally guaranteed Everest's obligations under the Leases. BofA Leasing later assigned its rights and obligations under the Leases to Midwest. The Leases were to expire in accordance with their terms on six dates between February 13, 2016 and July 4, 2016.

The Leases gave Everest an option, exercisable by irrevocable notice 360 days (but not less than 180 days) before the lease expiration date, either to (a) extend the term of the lease for a renewal period to be agreed on by the parties and at fair market value "as determined by the Lessor," or (b) to purchase the railcars at fair market value "as determined by the Lessor." Midwest alleges that Everest timely exercised this option via written letter on May 28, 2015, "irrevocably electing to either renew the Leases or purchase the railcars." FAC ¶ 20.

On July 8, 2015, Midwest contacted Everest via telephone and responded that the fair market value at the time was in the "mid-$500s per railcar per month" for rentals, and "between $70,000.00 and $80,000.00 per railcar" for purchase. *Id.* ¶ 21. On December 1, 2015, Midwest asked Everest via letter whether it intended to purchase the railcars or renew the lease, to which Everest responded by purporting to terminate or cancel its prior irrevocable election. *Id.* ¶¶ 23-24. On December 18, 2015, Midwest declared Everest in default, and on January 5, 2016, Everest stated its intention to return the railcars at the end of each lease term. *Id.* ¶¶ 32-33.

Midwest alleges that it refrained from marketing the railcars to other parties after Everest's May 28 exercise of the option, and that the market for railcars significantly deteriorated between that time and Everest's repudiation on December 1, 2015. Midwest seeks recovery under five claims for relief: breach of the Leases by Everest for repudiating its irrevocable election to purchase or renew the lease the railcars, breach of Hendricks' guaranty agreement, promissory estoppel, failure to negotiate in good faith, and negligent misrepresentation.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-05312-JGK    Document 17-1    Filed 08/08/25    Page 32 of 46

Midwest Railcar Corporation v. Everest Railcar Services, Inc., Not Reported in Fed....

2017 WL 1383765

Midwest alleges that it suffered damages by the deteriorated price of railcars during the period between Everest's exercise of the option and its purported cancellation of that exercise. As a remedy, Midwest seeks specific performance and unspecified money damages.

## II. Everest's Counterclaims

**\*2** Everest's answer denies liability and alleges counterclaims. Everest alleges that its May 28, 2015 letter was not an invocation of an irrevocable option, but merely indicated "a willingness to either renew the Lease or to purchase the railcars upon receiving specific terms of the renewal or the purchase." Counterclaims ¶ 103. Everest agrees that the parties spoke on July 8, 2015, but alleges that the Midwest representative informed Everest that he would have to speak to Midwest's CEO "before they could discuss terms of any renewal or purchase of the railcars." Everest further alleges that Midwest never called back with more specifics. *Id.* ¶ 104. When Midwest failed to respond, Everest, by emails of November 30 and December 1, 2015, advised Midwest that it would not renew the lease or purchase the railcars, but would instead return the railcars upon expiration of each lease. *Id.* ¶ 105.

Following Midwest's December 1 letter, which seemingly ignored Everest's emails offering to the return the railcars and instead inquired as to whether Everest intended to lease or purchase, the parties engaged in further discussion over potential lease or purchase terms, but without agreement. Everest alleges that during these discussions, it informed Midwest that similar railcars had been marketed to Everest for $275 per month on a full service basis, under which the lessor is responsible for maintenance and repairs. Everest further alleges that its leases with Midwest are net leases, under which the lessee is responsible for such upkeep, and that the difference between the fair market value of a full service lease and a net lease is approximately $75 per car. *Id.* ¶¶ 108-112. On December 4, 2015, however, Midwest informed Everest that it was interested in a five-year renewal term at a rental price in the "high 300s" per railcar. *Id.* ¶ 113. Negotiations continued thereafter but, Everest alleges, "Midwest continued to offer alleged fair market value purchase and renewal rates to Everest that were well-above and beyond the actual fair market value renewal or purchase rates for the railcars at issue." *Id.* ¶ 114.

Having concluded that Midwest was not negotiating in good faith, Everest then offered to return the railcars in accordance with the lease terms. *Id.* ¶ 116. In response, on December 18,

2015, Midwest sent Everest a notice of default via written letter, which charged Everest with refusing "to consummate a renewal or purchase," stated that Everest's offer to return the railcars constituted repudiation of its irrevocable exercise of the option, and gave Everest thirty days to cure its default, either by executing renewal leases enclosed with the letter, or purchasing at $72,500 per railcar. Midwest also asserted that Everest's attempt to return the railcars was itself a breach of the parties' agreement because Section 13 of the Master Lease Agreement requires Everest to provide Midwest with at least 180 days written notice of its intention to return the railcars. Counterclaims, Ex. K.

Everest responded on January 5, 2016, again offering to return the railcars and stating that its offer to return the railcars constituted cure. Counterclaims, Ex. L. Midwest responded by instructing Everest to store the railcars for 180 days and to then return the railcars to a specified location: Transco Railway Products in Oelwein, Iowa. Counterclaims ¶ 121. Everest alleges, however, that the Leases require the lessee to return the railcars to a "mutually acceptable interchange point." *Id.* ¶ 117. Based on these facts, Everest alleges that Midwest breached the Leases by failing to negotiate in good faith the terms of the renewal or purchase, and by unilaterally designating the return location.

Everest also asserts four causes of action relating to damages it claims to have incurred as a result of Midwest's interference with subleases (the "Subleases") of the railcars that Everest entered into with Everest Halliburton Energy Services, Inc. ("Halliburton"). The parties—Everest, Midwest and Halliburton—entered into an agreement under which Halliburton made rent payments owed under the Subleases to a lock box controlled by Midwest. Midwest, in turn, after deducting rental payments owed by Everest to Midwest, then remitted the remaining balance to Everest. *Id.* ¶¶ 141-42.

**\*3** The Subleases provide that Halliburton must pay rent until the railcars are returned to Everest. Halliburton has not yet returned the railcars, and therefore continues to owe rent to Everest. *Id.* ¶¶ 144-46. However, since December 30, 2015, Everest has not received any remittal payments from Midwest as paid through the lock box by Halliburton. *Id.* ¶¶ 147-49. Everest alleges that Midwest has converted Halliburton's rent payments by withholding the excess from Everest or, in the alternative, that Halliburton has ceased making payments to the lock box as a result of Midwest's interference with Everest's contractual relationship with Halliburton.

Case 1:25-cv-05312-JGK   Document 17-1   Filed 08/08/25   Page 33 of 46

Midwest Railcar Corporation v. Everest Railcar Services, Inc., Not Reported in Fed....

2017 WL 1383765

Everest asserts four counterclaims against Midwest relating to Everest's relationship with Halliburton: conversion, unfair competition, tortious interference with contract, and tortious interference with prospective business relationship.

### III. The Relevant Lease Terms

New York law governs interpretation of the relevant contracts, as the Master Lease Agreement provides that "this Agreement and any Schedule hereto shall be interpreted under, and its performance shall be governed by, the laws of the States of New York." Master Lease Agreement § 28.

Regarding Everest's option to renew the leases or purchase the railcars, Section 11 of each of six Leases provides, as relevant, as follows:

Extension; Purchase Options. Provided no Event of Default has occurred and remains uncured, and upon Lessee having provided Lessor with written notice not more than 360 days or less than 180 days prior to expiration of the Lease Term, Lessee may irrevocably elect to:

(i) extend the Lease Term as to all and not less than all of the Units under this Schedule for a renewal period to be agreed upon by Lessee and Lessor for an amount equal to the then fair market value of the Units, as determined by Lessor, plus applicable taxes, payable monthly by Lessee to Lessor on the first day of each month during the extension term. ...; or

(ii) purchase all of Lessor's right, title and interest in all, but not less than all, of the Units under this Schedule, free from all liens and encumbrances created by Lessor, but otherwise on an "AS-IS, WHERE-IS," quitclaim basis, for a purchase price equal to: the then fair market value of the Units, as determined by Lessor; *plus* all Base Rent installments, late charges and other amounts then due and owing under the Lease; *plus* all applicable taxes, assessments and other charges[.]

Leases § 11. For purposes of purchasing the railcars, the Leases define "fair market value" as the "amount which would be obtained in an arm's-length transaction between an informed and willing buyer-user (other than a buyer currently in possession or a used equipment or scrap dealer) and an informed and willing seller, each under no compulsion to buy or sell[.]" *Id.* The Leases similarly define "fair market rental value" as the "amount which would be obtained in an arm's-length transaction between an informed and willing lessee (other than a lessee currently in possession) and an informed and willing lessor, each under no compulsion to lease." *Id.*

Section 13 of the Master Lease Agreement provides that "prior to the expiration of the Lease Term of any Lease, Lessee shall provide a minimum of 180 days irrevocable written notice to Lessor of its intention to return all but not less than all of the Units." Master Lease Agreement § 13.

Section 12 of the Leases provides that the "Lessee shall return the Railcars to Lessor at Lessee's expense to a mutually acceptable interchange point." Leases § 12. However, Section 2 of Annex II to each Lease, entitled "Supplemental Return Conditions," states that "upon expiration or any earlier termination of the Lease, all Equipment shall be returned to the location(s) designated by Lessor in the same condition as when first accepted by Lessee." Leases, Annex II § 2.

Lastly, the Master Lease Agreement provides that failure "to observe or comply with any other covenant or obligation under any lease," as well as "any attempted repudiation, breach or default of any guaranty of Lessee's obligations hereunder or any lease," both constitute an "Event of Default" under the agreement. Master Lease Agreement § 20.

### DISCUSSION

### I. Midwest States a Claim for Breach of Contract Due to Everest's Repudiation of Its Exercise of the Irrevocable Option

**\*4** Everest's letter of May 28, 2015 states the following: "This letter will serve as our written notice to either renew the lease at terms to be negotiated or exercise a purchase option at an amount to be negotiated." Ex. I. This is more than an inquiry. It is an irrevocable exercise of the option that Section 11 of the Leases grants to Everest, the lessee. It also constitutes an unambiguous rejection of the alternative option granted to Everest in Section 13 of the Master Lease Agreement, which permits Everest to return the railcars to Midwest provided that Everest gives at least 180 days' notice of its intent to return the railcars. Reading these two provisions together, Everest had to decide not less than 180 days prior to the expiration of each Lease whether to return the railcars, or to purchase or lease them again. Everest's letter of May 28, 2015 not only functioned as an exercise of the option to renew or purchase, but as a rejection of the option to return the railcars at the expiration of each lease.

Case 1:25-cv-05312-JGK    Document 17-1    Filed 08/08/25    Page 34 of 46

Midwest Railcar Corporation v. Everest Railcar Services, Inc., Not Reported in Fed....

2017 WL 1383765

Section 11 of the Leases sets the purchase or lease renewal price as the "amount equal to the then fair market value ... as determined by Lessor." Everest's May 28 letter sought to vary this term by seeking renewal or purchase at terms and amount "to be negotiated." This variance had no legal effect with respect to the price, and Midwest was entitled to ignore Everest's effort to change the process for renewal. The terms of the option in this respect are sufficiently definite, for fair market value can be determined objectively, and Midwest's right to determine fair market value is limited by such objective determination. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 110 (N.Y. 1981) (option provisions that base renewal price on an "objective extrinsic ... standard on which the amount [is] made to depend" are sufficiently definite and thus enforceable); *Best Way Realty v. Perlegis,* 831 N.Y.S.2d 351 (N.Y. Sup. Ct. 2006) (an "option's use of fair market value as a purchase price is a permissible reference to an external objective standard and is sufficiently definite to be enforceable.").

Thus, Midwest has stated a claim for breach of contract as a result of Everest's purported revocation of its exercise of the irrevocable option.

## II. Everest Fails to State a Claim for Breach of Contract

Everest alleges that Midwest breached the parties' agreement in two respects. First, Everest alleges that Midwest failed to negotiate in good faith the terms of Everest's lease renewal or purchase. Second, Everest alleges that when it offered to return the railcars, Midwest unilaterally selected the return location in breach of Section 12 of the Leases, which provides that the railcars shall be returned to a "mutually acceptable interchange point." Both theories fail as a matter of law.

"A breach of the duty of good faith and fair dealing is considered a breach of contract." *Fishoff v. Coty Inc.,* 634 F.3d 647, 653 (2d Cir. 2011). Everest argues that following the July 8 telephone call, Midwest "failed to participate in negotiations from July 2015 to December 1, 2015," which Everest presents as evidence of Midwest's failure to negotiate in good faith. However, the only specific fact alleged is that during the July 8 telephone call, Midwest's representative "indicated he would call Defendant Hendricks back with more specifics," but that "he never did." Counterclaims ¶ 104. Even accepting this allegation as true, it is not suggestive of a refusal to negotiate in good faith on the part of Midwest. Everest does not allege, for example, that it ever followed up with Midwest after the July 8 phone call or that it made any further effort

to finalize the terms of the lease renewal or purchase, even though it was the party that invoked the option. Rather, the parties appear to have mutually ignored each other throughout this period; their next interaction was on November 30, 2015, when Everest informed Midwest that it no longer sought to renew the lease or purchase the railcars.

**\*5** When the parties finally did engage in negotiations in early December 2015, Midwest first proposed a five-year lease at a rental price in the "high 300s" per railcar. Midwest contends this is evidence of Midwest's failure to negotiate in good faith, presumably because this figure was higher than fair market value. Midwest counters that this proposal could not have been made in bad faith because the Leases provide that fair market value is to be "determined by the Lessor." That may be true, but Midwest still had an obligation to propose a lease or purchase price that reflected "the then fair market value of the Units." It would not be in good faith to propose a figure inconsistent with fair market value, which is an objective, determinable number, for "even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement." *19 Recordings Ltd. v. Sony Music Entm't,* 165 F. Supp. 3d 156, 161 (S.D.N.Y. 2016) (quoting *Richbell Info. Servs. v. Jupiter Partners, L.P.,* 765 N.Y.S.2d 575, 587 (1st Dep't 2003)).

Still, Everest's claim fails for two reasons. First, merely alleging that Midwest's initial proposal was above fair market value does not permit an inference that Midwest provided that figure to purposefully frustrate and derail the negotiations. It is true that when negotiating the terms of a binding preliminary agreement, a party must refrain from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011). On the other hand, the implied covenant of good faith and fair dealing "does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.,* 30 N.Y.2d 34, 46 (N.Y. 1972)).

Beyond this single specific allegation, Everest alleges only that following Midwest's December 4 proposal, "Midwest continued to offer alleged fair market value purchase and renewal rates to Everest that were well-above and beyond

Case 1:25-cv-05312-JGK    Document 17-1    Filed 08/08/25    Page 35 of 46

Midwest Railcar Corporation v. Everest Railcar Services, Inc., Not Reported in Fed....

2017 WL 1383765

the actual fair market value renewal or purchase rates for the railcars at issue." Counterclaims ¶ 114. But this type of generalized allegation is insufficient, for to "state a claim for breach of contract for failure to negotiate in good faith, a plaintiff must allege the specific instances or acts that amounted to the breach; generalized allegations and grievances will not suffice[.]" *L-7* Designs, 647 F.3d at 431 (internal citations and quotation marks omitted). Everest's reference to "continued" offers in excess of fair market value is insufficient because Everest does not identify what those offers were, when they were made, how Everest responded to them, or what benchmark Everest used to conclude that Midwest's offers were in excess of fair market value.

Second, even if Everest had alleged more than one specific example of a bad faith offer, Everest fails to allege in non-conclusory terms that any such offers were in fact above fair market value. As a preliminary matter, the parties do not address the date on which fair market value is to be calculated. Section 11 of the Leases refers to "the *then* fair market value of the Units." Leases § 11 (emphasis added). Presumably the word "then" refers to the date on which the option was exercised, but there is sufficient ambiguity in the term to allow the parties to prove parol evidence to clarify this ambiguity. I need not resolve this question of interpretation, however, for Everest has not alleged what the actual fair market value was at any point during the relevant time period.

Everest alleges only that on some unspecified date, a third party marketed "similar cars" to Everest "at a rate of $275 per car per month," Counterclaims ¶ 108, and that this offer concerned a full service lease, which is typically priced approximately $75 higher than a net lease. This single fact is insufficient to establish what the fair market value was for net lease railcars during this period, particularly in light of Midwest's allegation that "the market for railcars significantly deteriorated" between May 28, 2016 (the date of Everest's invocation of the option) and December 1, 2015 (the date of Everest's repudiation). FAC ¶ 25. Everest therefore fails to plausibly allege a claim for failure to negotiate in good faith. *See 19 Recordings Ltd. v. Sony Music Entm't,* 165 F. Supp. 3d 156, 165 (S.D.N.Y. 2016) (dismissing claim for breach of duty of good faith and fair dealing where complaint lacked any allegation that compensation at issue deviated from fair market value and where "the allegation regarding the royalty rate by itself being below fair market value is lacking in detail that would allow a finding of bad faith.").

**\*6** Lastly, Everest alleges that Midwest breached the Leases by unilaterally selecting a return location for the railcars, instead of negotiating a "mutually acceptable interchange point," as Section 12 of the Leases requires. Midwest counters that Section 2 of Annex II of the Leases provides that "upon expiration or any earlier termination of the Lease, all Equipment shall be returned to the location(s) designated by Lessor[.]" These two provisions appear to conflict with each other. However, I need not resolve that conflict because Everest fails to allege that it ever objected to Midwest's designated return location, or otherwise made any attempt to negotiate the return location with Midwest, as Section 12 of the Leases provides for. In fact, in Everest's January 5, 2016 letter, it asked Midwest to "please notify [Everest] of an acceptable interchange point for said returns," which strongly suggests that Everest had elected to defer to Midwest's proposed return location. Regardless, absent any allegation that Everest attempted to negotiate the return location but was rebuffed by Everest, this claim fails.

For these reasons, Everest's breach of contract claim is dismissed.

### III. Everest Fails to State a Claim for Conversion

Everest alleges that Midwest converted funds paid by Halliburton properly owed to Everest by failing to remit to Everest excess payments received from Halliburton. Specifically, Everest alleges that as of December 30, 2015, it no longer "received any rent payments from Midwest as paid through the lox box by Halliburton." Counterclaims ¶ 148.

"To establish a cause of action for conversion under New York law, a plaintiff must show (1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Phansalkar v. Andersen Weinroth & Co., L.P.,* 175 F. Supp. 2d 635, 639 (S.D.N.Y. 2001) (internal quotation marks omitted). "An action for conversion of money may be made out where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Thys v. Fortis Sec. LLC,* 903 N.Y.S.2d 368, 369 (1st Dep't 2010).

Everest's conversion claim fails because it has not shown "legal ownership or an immediate superior right of possession" to the payments that Halliburton deposited into the lock box subsequent to Everest's repudiation of its

exercise of the option. Amendments to Everest's sublease agreement with Halliburton (the "Subleasing Consent and Amendment"), which all parties involved signed and agreed to, set out the terms under which Midwest was obligated to remit to Everest excess payments received from Halliburton. As relevant here, Midwest had no obligation to remit excess payments to Everest in the event that Everest attempted to repudiate any of its obligations under Leases, for such repudiation constituted an Event of Default under Section 20 of the Master Lease Agreement.

Specifically, the Subleasing Consent and Amendment provides that upon any Event of Default, Everest "shall not be entitled to receive any amount that would otherwise constitute Excess Funds," and permits Midwest to hold such amounts as "cash collateral ... to be applied to the Obligations in such order and manner as determined by [Midwest] in its sole discretion." Subleasing Consent and Amendment § 9. These terms make clear that Midwest was under no obligation to remit excess funds to Everest as of December 30, 2015, the date it alleges that Midwest ceased making remittal payments. Everest's conversion claim fails even if it is ultimately determined that Everest did not in fact breach the contract by purporting to repudiate its invocation of the option, for the terms further provide that "the determination of the amount of Excess Funds owing to [Everest] shall be made by [Midwest] in accordance with the Agreement and the related documents and instruments, and its determination therefore shall be conclusive in the absence of manifest error." *Id.* Here, given the unambiguous nature of both Everest's exercise of the option and its subsequent repudiation, Midwest's belief that an Event of Default occurred was not manifest error.

**\*7** For these reasons, Everest's conversion claim is dismissed.

### IV. Everest Fails to State a Claim for Unfair Competition

Everest alleges that Midwest unfairly competed with Everest by (1) exploiting the skill, labor and goodwill that Everest invested into its relationship with Halliburton in order to gain commercial advantage; and (2) misappropriating Everest's confidential pricing schedule with Halliburton in order to unfairly undercut Everest's pricing.

Regarding the first of these two allegations, Everest alleges only that it "invested significant skill, labor and goodwill in developing its relationship with Halliburton." Counterclaims ¶ 157. It does not further identify what this "skill, labor and

goodwill" consisted, how Everest invested it, or how it relates to Everest's relationship with Halliburton. Nor does Everest allege *how* Midwest exploited this skill, labor or goodwill to gain commercial advantage. This allegation is conclusory, and therefore will not be credited. *See Ashcroft v. Iqbal,* 556 U.S. 662, 681 (2009).

In support of its allegation that Midwest misappropriated confidential pricing information, Everest alleges only that Midwest "misappropriated Everest's pricing schedule in an effort to undercut Everest's prices on direct leases between Halliburton and Midwest," and that Midwest "used its knowledge of Everest's confidential rental prices to its own advantage, and has entered into direct leases with Halliburton since the dispute over the Leases arose." Counterclaims ¶¶ 156, 158.

Unfair competition claims sounding in misappropriation "often involve[ ] misappropriate of trade secrets or ideas." *Friedman v. Wahrsager,* 848 F. Supp. 2d 278, 303 (E.D.N.Y. 2012); *see also Am. Bldg. Maint. Co. of N.Y. v. Acme Prop. Servs., Inc.,* 515 F. Supp. 2d 298, 311 (N.D.N.Y. 2007) ("Courts have found that the misappropriation of detailed, internal customer information can give rise to a claim of unfair competition, but only when that customer information has several of the attributes of a trade secret and is being used in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.").

Here, the price Everest charged Halliburton to sublease railcars does not qualify as a trade secret because Everest has not alleged any non-conclusory facts indicating that the fees it charged Halliburton were confidential or that Halliburton was under any obligation not to disclose that information to third-parties. The pricing schedule therefore "cannot be considered to be of a genuinely 'secret' nature," for the "mere fact that it suited plaintiff that the information be kept from other bidders does not confer trade secret status upon the information." *Wiener v. Lazard Freres & Co.,* 672 N.Y.S.2d 8, 15 (1st Dep't 1998); *see also Marietta Corp. v. Fairhurst,* 754 N.Y.S.2d 62, 67 (3d Dep't 2003) ("pricing data" does not qualify as a trade secret); *TNS Media Research LLC v. TRA Glob., Inc.,* 977 F. Supp. 2d 281, 315 (S.D.N.Y. 2013) ("Price lists ... are not, as a matter of law, protected as trade secrets."). The reason for this general rule is that pricing information is often accessible directly from customers who "routinely disclose such information to rival vendors in order to foster price competition." *Ikon Office Sols., Inc. v. Usherwood Office Tech., Inc.,* 875 N.Y.S.2d 820 (N.Y. Sup. Ct. 2008); *see also*

Case 1:25-cv-05312-JGK    Document 17-1    Filed 08/08/25    Page 37 of 46
Midwest Railcar Corporation v. Everest Railcar Services, Inc., Not Reported in Fed....
2017 WL 1383765

*Silipos, Inc. v. Bickel,* 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) (plaintiff's "discount prices are not trade secrets because they are well known" and because "customers in this narrow industry liberally talk about discounts of the different manufacturers with which they work in order to negotiate the lowest prices.").

**\*8** Under certain circumstances, a misappropriation claim may have merit even if trade secrets are not involved. For example, "a claim may be based on misappropriation of client lists, internal company documents, and business strategies," but only if " 'wrongful or fraudulent tactics [are] employed.' " *Barbagallo v. Marcum LLP,* 820 F. Supp. 2d 429, 447 (E.D.N.Y. 2011) (quoting *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387 (N.Y. 1972)).

Everest does not allege any specific facts regarding how Midwest employed "wrongful or fraudulent tactics" to undercut Everest's pricing. Indeed, regardless of whether trade secrets are involved or not, a "plaintiff asserting an unfair competition claim under New York common law must also show that defendant acted in bad faith." *Luv n' Care, Ltd. v. Mayborn USA, Inc.,* 898 F.Supp.2d 634, 643 (S.D.N.Y. 2012). Even accepting as true that Midwest used the pricing information to its advantage, Everest has not alleged any facts indicating that Midwest acted in bad faith. It does not allege, for example, that Midwest obtained the pricing information by using improper means, nor does it allege that Midwest used the pricing information for the specific purpose of injuring Everest.

As a competitor of Everest in the railroad industry, Midwest had no common law or contractual obligation to refrain from competing with Everest's customers, for it is well-established that competition alone does not establish the kind of "commercial immorality" that gives rise to an unfair competition claim. *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir. 1982).

For these reasons, Everest's unfair competition claim is dismissed.

### V. Everest Fails to State a Claim for Tortious Interference with Contract

A party alleging tortious interference with contract must "establish (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, (3) the defendant's intentional interference with the contract, and (4) damages."

*Waste Serv., Inc. v. Jamaica Ash & Rubbish Removal Co.,* 691 N.Y.S.2d 150, 152 (2d Dep't 1999). Here, Everest alleges that "by failing to distribute rent payments to Everest deposited to the lock box by Halliburton, Midwest has intentionally interfered with the Halliburton Subleases and has induced and/or otherwise caused Halliburton not to perform its obligations under the Halliburton Subleases." Counterclaims ¶ 150. Everest also alleges that Halliburton no longer wants to do business with Everest because "Everest was unable to designate a location where the railcars at issue could be both stored and returned as a cost savings to Halliburton." Counterclaims ¶ 154. Finally, Everest alleges that "Halliburton has signed leases directly with Midwest since the dispute between Midwest and Everest over the Leases arose." Counterclaims ¶ 159.

Everest fails to state a claim for tortious interference with contract because Midwest was contractually permitted to engage in the acts that Everest alleges amount to "intentional inference." As discussed above (in the context of Everest's conversion claim), Midwest was permitted to cease remitting excess payments to Everest following Everest's repudiation. A claim for tortious interference with contract, however, "cannot rest on conduct that is incidental to some other lawful purpose." *Aniero Concrete Co. v. N.Y. City Const. Auth.,* 1997 WL 3268, at *19 (S.D.N.Y. Jan. 3, 1997) (internal quotation marks omitted); *see also Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.,* 83 F. Supp. 2d 384, 391 (S.D.N.Y. 2000) ("[T]he action that induces the alleged breach cannot have been one that the accused tortfeasor was privileged to take."). Likewise, Everest's claim that it was "unable to designate" a return location that would bring Halliburton "cost savings" is irrelevant because Everest had no such contractual right.

**\*9** Because Everest alleges no specific facts indicating that Midwest intentionally interfered with its sublease with Halliburton, Everest's claim for tortious interference with contract is dismissed.

### VI. Everest Fails to State a Claim for Tortious Interference with Prospective Business Relationship

To state a claim for tortious interference with prospective business relationship, a plaintiff must allege "(1) the existence of a prospective business relationship; (2) defendants' knowledge of, and interference with, such relationship; (3) defendant's malice or use of wrongful means; and (4) harm to plaintiff." *Granger v. Gill Abstract Corp.,* 566 F. Supp. 2d 323, 333 (S.D.N.Y. 2008). " 'Wrongful means' include physical violence, fraud or mis-representation, civil suits and

criminal prosecutions." *Schoolcraft v. City of N.Y.,* 103 F. Supp. 3d 465, 525 (S.D.N.Y. 2015). To constitute wrongful means, "generally, the conduct must amount to a crime or an independent tort, or must have been engaged in 'for the sole purpose of inflicting intentional harm on plaintiffs.' " *Technest Holdings, Inc. v. Deer Creek Fund LLC,* 2008 WL 3449941, at *10 (S.D.N.Y. Aug. 12, 2008) (quoting *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 190 (N.Y. 2004)).

This claim fails for the same reason that the tortious interference with contract claim fails: Midwest was legally permitted to do the things that Everest identifies as tortious interference with its relationship with Halliburton. As such, Everest's allegations cannot satisfy the requirement that Midwest utilized "wrongful means" to achieve the alleged interference.

Accordingly, Everest's claim for tortious interference with prospective business relationship is dismissed.

**CONCLUSION**

For the reasons stated herein, Midwest's motion to dismiss Everest's counterclaims is granted. The Clerk shall terminate the motion (Dkt. No. 36). The deficiencies of the counterclaims do not appear to be curable and are therefore dismissed without leave to amend. A status conference will be held on May 12, 2017 at 10 a.m. The parties shall propose a discovery plan for my consideration at the conference.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1383765

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 4

1999 WL 728641
United States District Court, S.D. New York.

SHEPARD INDUSTRIES, INC., Plaintiff,

v.

135 EAST 57TH STREET, LLC,
and COHEN BROTHERS REALTY
CORPORATION, Defendants.

No. 97 CIV. 8447(DAB).
|
Sept. 17, 1999.

**Attorneys and Law Firms**

Schechter & Nimkoff, LLP, The Crystal Pavilion, New York, Ronald A. Nimkoff, Robert J. Schechter, Harvey B. Silikovitz, for Plaintiff.

Itkowitz Gottlieb & Harwood, New York, Jay B. Itkowitz, Donald A. Harwood, Allyn Crawford, for Defendants.

MEMORANDUM & ORDER

BATTS, District J.

**\*1** Plaintiff Shepard Industries, Inc. ("Plaintiff") brings this diversity action against Defendants 135 East 57th Street, LLC ("LLC"), and Cohen Brothers Realty Corporation ("Cohen Brothers Realty")(collectively, "Defendants"), seeking an injunction and damages for tortious interference with contract and business relations, and unlawful restraint of trade in violation of the "Donnelly Act," New York General Business Law § 340, *et seq*. Defendants move pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure to dismiss all the claims. Defendants also move to vacate a temporary restraining order issued by this Court on or about November 20, 1997, enjoining them from interfering with Shepard's provision of cleaning and maintenance services to tenants in Defendants' building. For the following reasons, Plaintiff's motion is denied, Defendants' motion to vacate is granted, and Defendants' motion to dismiss is granted in part and denied in part.

I. BACKGROUND

Plaintiff is a New Jersey corporation and contractor that provides, *inter alia,* a full range of cleaning and maintenance services to office buildings and their commercial tenants in the New York metropolitan area. (Am.Compl.¶ 6.) Beginning about April, 1996, Plaintiff was selected by the manager of the building at 135 East 57th Street (the "Building") to provide basic cleaning services to the Building and its tenants. (Am.Compl.¶ 11.) Around the same time, at least nine tenants (collectively, the "Tenant–Clients") also retained Plaintiff to provide continuous supplemental cleaning and maintenance services for their offices beyond the basic services they received. (Am.Compl.¶ 12.)[1] By mid-September, 1997, Plaintiff's monthly billings to the Tenant–Clients for these supplementary services totaled approximately $24,000 per month. (Am.Compl.¶ 14.)

[1]   These services included, among others, carpet care, auxiliary vacuuming, floor maintenance, provision of lavatory supplies, kitchen maintenance, wet rubbish removal, provision of a licensed exterminator, glass maintenance, and desk, wall, door, and lighting maintenance. (Am.Compl.¶ 13.)

Around September, 1997, the Building was sold to Defendant LLC, which subsequently appointed Defendant Cohen Brothers Realty as the Building's Management Agent. (Am.Compl.¶ 16.) Defendants immediately terminated Shepard as supplier of basic cleaning services for the Building. (Am.Compl.¶ 17.) Furthermore, Defendants enacted a series of building regulations (collectively, the "Restrictions") that provided, among other things, that when an outside contractor entered the Building, the tenant who retained that contractor would be required to pay a freight elevator charge of $150 per hour after 5 P.M., and to hire a security guard at a cost of $35 per hour for each floor on which the contractor worked for the time the contractor remained in the Building. (Am.Compl.¶¶ 18, 19.) The fees would be imposed whether or not the contractor in fact used the freight elevator. (Am.Compl.¶ 19.) If the tenants elected to purchase their supplemental cleaning and maintenance services from either the Defendants themselves or one or more contractors in which the Defendants had an interest (collectively, the "Favored Contractors"), these charges would not apply.[2] (Am.Compl.¶¶ 17, 18.)

[2]   Despite a letter from one of the Tenant–Clients stating both that the use of a freight elevator would not be necessary in order for Plaintiff to work in its offices, and that the Tenant–Client would provide the requisite security at all times when Plaintiff's employees were

1999 WL 728641, 1999-2 Trade Cases P 72,664

present in its offices, Defendants stated that Plaintiff could not have access to the Building unless the Tenant–Client complied with the Restrictions. (Am.Compl.¶ 24.)

**\*2** Security personnel denied access to two of Plaintiff's employees in late September, 1997, stating that Plaintiff would only be allowed to enter the Building with a letter of authorization from Defendants. (Am.Compl.¶¶ 28, 29.) Defendants have repeatedly refused to issue such a letter. (Am.Compl.¶ 29.) Around October 1, 1997, several hours after Plaintiff's employees entered the Building and began performing work for two of the Tenant–Clients pursuant to Plaintiff's agreements with them, security personnel claimed that Plaintiff's employees were trespassing and compelled them to leave the Building. (Am.Compl. ¶ 30.) As a result of the Restrictions and the overt exclusion of its employees from the Building, Plaintiff could not perform work in the Building on a competitive basis. (Am.Compl.¶ 31.)

Plaintiff brought the instant suit claiming that Defendants tortiously interfered with its contracts with the Tenant–Clients, as well as its business relations with both the Tenant–Clients and other tenants in the Building. Plaintiff also claims that Defendants' relationship with the Favored Contractors constitutes a restraint of trade in the market for supplemental cleaning and maintenance services in the Building, in alleged violation of the "Donnelly Act," New York General Business Law § 340. This Court issued a temporary restraining order on November 21, 1997, enjoining Defendants from interfering with Plaintiff's provision of supplemental cleaning and maintenance services to the Tenant–Clients. By Stipulation signed by the parties on November 25, 1997, the parties consented to extending the restraining order pending the determination of Plaintiff's preliminary injunction motion and Defendants' motion to dismiss.

## II. DISCUSSION

### A. Standard for Motion to Dismiss

It is axiomatic that "on a motion to dismiss under 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "When determining the sufficiency of plaintiff's claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiff's amended complaint... to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing

suit." *E. & G. Gabriel v. Gabriel Bros. Inc.,* No. 93 Civ. 0894, 1994 WL 369147 at \*2 (S.D.N.Y.1994) (citations omitted). In deciding a 12(b)(6) motion, the Court's function "is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint is legally sufficient." *Festa v. Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990). Thus, the District Court should grant such a motion only if after viewing the plaintiff's allegations in this favorable light, "it appears beyond doubt the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992) (quoting *Ricciuti v. New York City,* 941 F.2d 119 (2d Cir.1991)). It should also be recalled that in the antitrust context, "where the proof of the alleged antitrust violation is largely in the hands of the defendants, dismissals prior to giving the plaintiff an opportunity for discovery should be granted sparingly." *Pepsico, Inc. v. Coca–Cola Co., Inc.,* No. 98 Civ. 3283, 1998 WL 547088 at \*3 (S.D.N .Y.1998) (citations omitted).

### B. The Donnelly Act

**\*3** Defendants argue that Plaintiff fails to state a cause of action under the Donnelly Act because the restrictive conditions in the lease grant Defendants the right to choose a cleaning contractor for the building and to exclude any other cleaning service provider. (Defs.' Mem. Law at 13.) Defendants further argue that Plaintiff fails to state a claim under the Donnelly Act because the restrictive condition in question is reasonable and limited in scope to one building. (Defs.' Mem. Law at 16.) The issue of reasonableness with respect to a lease restriction is an appropriate determination for a trier of fact, and is an inappropriate determination for purposes of a 12(b)(6) motion. *X.L.O. Concrete Corp. v. Rivergate Corp.,* 83 N.Y.2d 513, 517 (N.Y.1994)(finding that where substantial questions of fact remained, summary judgment on the plaintiff's Donnelly Act claim was inappropriate). However, Plaintiff fails to state a claim under the Donnelly Act for other reasons.

The Donnelly Act provides, in pertinent part:

> Every contract, agreement, arrangement or combination whereby[:]
>
> A monopoly in the conduct of any business, trade, or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby

1999 WL 728641, 1999-2 Trade Cases P 72,664

Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state is or may be restrained or whereby

For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade, or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy; illegal and void.

19 Consol. N.Y. Gen. Bus. Law § 340 (McKinney 1988). A party alleging a conspiracy in violation of the Donnelly Act must identify the relevant product market, describe the nature and effects of the purported conspiracy, and allege how the economic impact of the conspiracy is to restrain trade in the market in question. *International Television Productions, Ltd. v. Twentieth Century–Fox,* 622 F.Supp. 1532, 1535 (S.D.N.Y.1985)(applying New York law). "The first step in a court's analysis must be a definition of the relevant markets... because [w]ithout a definition of that market, there is no way to measure [a defendant's] ability to lessen or destroy competition."[3] *Pepsico, Inc.,* 1998 WL 547088 at *4. Moreover, the alleged product market must be theoretically plausible. *E. & G. Gabriel,* 1994 WL 369147 at *2. Accordingly, in the context of motions to dismiss, federal courts "have not hesitated to reject market allegations that make no economic sense." *Id.*

[3]   Although *Pepsico* involved an alleged violation of the Sherman Antitrust Act, the Donnelly Act is generally construed in accordance with the Sherman Act. *Re–Alco Indus., Inc. v. National Center for Health Education,* 812 F.Supp. 387, 393 (S.D.N.Y.1993) (citations omitted). The Sherman Act and the Donnelly Act require identical basic elements of proof for claims of monopolization or attempt to monopolize, *id.,* and the Donnelly Act was modeled on the Sherman Act. *See New York v. Mobil Oil Corp .,* 38 N.Y.2d 460 (N.Y.1976).

For antitrust purposes, a relevant market consists of both a product market— those commodities or services that are reasonably interchangeable, and a geographic market—the area in which such reasonable interchangeability occurs. *Pyramid Co. of Rockland v. Mautner,* 153 Misc.2d 458, 463 (N.Y.Sup.1992)(citing *Brown Shoe Co. v. United States,* 370 U.S. 294 (1962)). The plaintiff must explain "why the market it alleges is in fact the relevant, economically significant product market." *Re–Alco,* 812 F.Supp. at 391. In

the analogous federal antitrust context, if a complaint does not allege facts regarding substitute products, distinguish among apparently comparable products, or allege other pertinent facts relating to cross-elasticity of demand, a court may grant a Rule 12(b)(6) motion.[4] *Id.* (holding market defined as that for brand of health education materials insufficient to state a claim where complaint failed to discuss both existence or nonexistence of other health education materials, and any relevant differences in demand).

[4]   "Cross-elasticity of demand refers to the change in the demand by consumers for one product as a result of a change in the price of another product." *Smith & Johnson, Inc. v. Hedaya Home Fashions, Inc.,* No. 96 Civ. 582, 1996 WL 737194 at *5 n. 5 (S.D.N.Y.1996), *aff'd,* 125 F.3d 844 (2d Cir.1997) (citations omitted).

**\*4** In its Amended Complaint, Plaintiff defines the relevant product market as "the market for the provision of supplemental cleaning and maintenance services to tenants in the Building." (Am.Compl.¶¶ 35–36.) Plaintiff's definition of the geographic market at issue—"the Building"—is patently under-inclusive. The building at 135 East 57th Street presumably is not the only building in New York City, much less the only building on that street, to benefit from cleaning services provided by Plaintiff or its competitors. (Am.Compl.¶ 6.) Indeed, Plaintiff defines itself as "a contractor that provides... cleaning and maintenance services to office buildings and their commercial tenants in the New York metropolitan area." (Am.Compl.¶ 6.) Furthermore, Plaintiff alleges no facts in support of its claim that the single building in question constitutes a relevant geographic market for antitrust purposes.

Plaintiff also fails to allege a proper product market. While it does identify a potential product market—"the market for supplemental cleaning and maintenance services"—it offers no facts in support of its contention that this is indeed the relevant, economically significant product market at issue. Plaintiff does not allege any facts regarding substitute products or relating to cross-elasticity of demand, nor does Plaintiff distinguish between the "market for the provision of supplemental cleaning and maintenance services" and the market for the provision of any other kinds of cleaning and maintenance services. Finally, Plaintiff's own allegation that it "provides... a full range of cleaning and maintenance services," (Am.Compl.¶ 6), further supports the notion that the product market at issue cannot be so narrowly construed as to consist solely of the provision of "supplemental" services.

Plaintiff cites *Eagle Spring Water,* 236 N.Y.S.2d 266 (N.Y.Sup.1962), for the proposition that a landlord's exclusion of competing service providers from a building is a restraint of trade in violation of the Donnelly Act. (Pl.'s Mem. Law at 17.) However, *Eagle Spring Water* was decided as an adjudication on the merits, and not as a 12(b)(6) motion. Accordingly, the court there made factual determinations, inappropriate for purposes of the instant case, about the precise size of the market in question and the reasonableness of the defendant landlord's lease restrictions. 236 N .Y.S.2d at 276. Most importantly, and contrary to Plaintiff's assertions, the court found that the geographic market at issue included substantially more than simply the defendant's buildings. *Id.* at 278.

It is impossible, without an adequate market definition, to assess the anticompetitive effect of allegedly wrongful practices. *Re–Alco,* 812 F.Supp. at 392 (citations omitted); *see Pyramid Co.,* 153 Misc.2d at 463. Plaintiff's failure to allege a geographic market and a product market is thus fatal to its Donnelly Act claim. Accordingly, Plaintiff's Donnelly Act claim is dismissed.

## C. Tortious Interference with Contract

**\*5** Under New York law, the elements of a claim of tortious interference with contract are that (1) a valid contract exists; (2) a third party had knowledge of the contract; (3) the third party intentionally and improperly procured the breach of contract; and (4) the breach resulted in damages to the plaintiff. *Finley v. Giaccobbe,* 79 F.3d 1285, 1294 (2d Cir.1996). Plaintiff alleges the first two elements in the Amended Complaint. (Am. Compl. ¶¶ 12–13, 61; Pl.'s Mem. Law at 19.) Improper intentional interference is generally shown by a tortfeasor "inducing or otherwise causing a third person not to perform" his contractual obligations to the plaintiff. *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 189 (N.Y.1980)(quoting Restatement (Second) of Torts § 766 (1977)). Defendants argue that because their actions are authorized by the lease restrictions and because the lease restrictions are reasonable, Plaintiff has failed to state a claim for tortious interference with contractual relations. (Defs.' Mem Law at 18.) Again, the Court notes that determination of the nature and reasonableness of lease restrictions is inappropriate for purposes of a motion to dismiss pursuant to Rule 12(b)(6).

Construing the Plaintiff's factual allegations as true, the Court finds that the Plaintiff has stated a claim for tortious interference with contractual relations. At the time Defendants began engaging in the allegedly wrongful conduct, the Plaintiff had agreements with several of Defendants' tenants to provide supplemental cleaning and maintenance services to them. (Am.Compl.¶¶ 52, 61.) It is undisputed that Defendants had knowledge of these agreements. (Am. Compl. ¶¶ 52, 61; Defs.' Mem. Law at 18.) The Plaintiff states that "by imposing the Restrictions and wrongfully preventing Shepard's employees from physically entering the building," (Am.Compl.¶ 53), and "by imposing the Lease Renewal Condition, the [Defendants] intentionally rendered it impossible for the Tenant–Clients to continue to perform under the Shepard–Tenant agreements." (Am.Compl.¶ 62.) If true, this allegation sufficiently pleads the third element of the claim; whether or not Plaintiff can make this out at a later point in the proceedings is an open matter. Finally, Plaintiff alleges that it has lost revenues as a result of the interference in the amount of $24,000 per month. (Am.Compl.¶ 56.) If true, this allegation clearly satisfies the final element of the tortious interference with contract claim. Accordingly, Defendants' motion to dismiss Plaintiff's claim of tortious interference with contract is denied.

## D. Tortious Interference with Business Relations

Under New York law, a claim for tortious interference with business relations must meet requirements "more demanding than those for interference with [the] performance of an existing contract." *Kramer v. Pollock–Krasner Found.,* 890 F.Supp. 250, 258 (S.D.N.Y.1995)(citing *Fine v. Dudley D. Doernberg & Co.,* 203 A.D.2d 419 (N.Y.App.Div.1994)). In order to state a claim, a plaintiff must allege "the defendant's interference with business relations existing between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or in any way improper." *PPX Enterprises, Inc., v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 269 (2d Cir.1987) (citations omitted). If the defendant's interference is intended, at least partly, to advance its own interests, the claim will fail unless the means employed include criminal or fraudulent conduct. *Id.*

**\*6** As an initial matter, the Court notes that Plaintiff claims tortious interference both with existing business relations with the "Tenant–Clients, [who] would have extended their agreements with [Plaintiff]," (Pl.'s Mem. Law at 19), as well as with prospective business relations, "with tenants in the building who have not yet retained [Plaintiff's] services" (collectively, the "Prospective Tenant–Clients"). (Am.Compl.¶ 71.) With respect to the latter

1999 WL 728641, 1999-2 Trade Cases P 72,664

group, Plaintiff's claim fails immediately, because a plaintiff alleging tortious interference with business relations "must specify some particular, existing business relationship through which plaintiff would have done business *but for* the allegedly tortious behavior." *Kramer,* 890 F.Supp. at 258 (emphasis added)(citing *PPX Enterprises,* 818 F.2d at 269). Plaintiff alleges no existing relationship with the "Prospective Tenant–Clients," whoever they may be, and its allegedly "legitimate expectation of business relationships with them," (Am.Compl.¶ 71), is too speculative for purposes of this claim. *See Universal Marine Medical Supply, Inc. v. Lovecchio,* 8 F.Supp.2d 214, 221 (E.D.N.Y.1998) (defendant failed to state a claim for tortious interference with business relations absent any allegation of any specific existing business relations).

As to existing business relations with the Tenant–Clients, Defendants' activities appear to be intended to advance Defendants' own legitimate business interests, for even Plaintiff concedes that either Defendants or "one or more contractors in which [Defendants] had an interest" have replaced Plaintiff as supplier of supplemental cleaning and maintenance services. (Am.Compl.¶ 17.) Indeed, Plaintiff does not contest that Defendants may be considered its "competitor" in this respect. (Pl.'s Reply Mem. Law at 16; Defs.' Mem. Law at 19.)

Because Plaintiff and Defendants may be considered competitors, Plaintiff must allege that Defendants engaged in "criminal or fraudulent" conduct. *See In re Houbigant, Inc.,* 914 F.Supp. 964, 984 (S.D.N.Y.1995)(finding that because plaintiff and defendant were competitors, the requirement of "criminal or fraudulent" conduct was invoked). Because Plaintiff does not aver that Defendants were exclusively motivated to harm Plaintiff, Plaintiff must allege facts showing that Defendants interfered with its business relations by means that were so "dishonest, unfair, or in any way improper" as to rise to the level of "criminal or fraudulent" conduct. *See PPX Enterprises,* 818 F.2d at 269. Plaintiff alleges that Defendants engaged in behavior that was "dishonest, unfair, or otherwise improper," acted "maliciously and without the protection of any privilege," and accomplished its allegedly illegal restraint of trade by "coercion." (Am.Compl.¶¶ 72, 79.) However, none of this behavior, even when construed as true for purposes of this motion, rises to the level of "criminal or fraudulent" conduct. *See Paper Corp. v. Schoeller Technical Papers, Inc.,* 724 F.Supp. 110, 119 (S.D.N.Y.1989)(stating that "wanton, wilful, and outrageous" behavior did not rise to level of

"criminal or fraudulent" conduct); *Guard–Life Corp.,* 50 N.Y.2d at 191 (stating that persuasion alone, albeit knowingly directed at interference with the contract, does not amount to "criminal or fraudulent" conduct). Plaintiff does not even allege otherwise, referring to Defendants' conduct only as "abundant[ly] wrongful," but never so severely as "criminal" or "fraudulent." (Pl.'s Reply Mem. at 18.) *See Paper Corp.,* 724 F.Supp. at 119 (dismissing claim for tortious interference with business relations because plaintiff failed to allege "criminal or fraudulent" conduct). Because Plaintiff has not alleged any acts to suggest any "criminal or fraudulent" conduct by Defendants, its claim for tortious interference with business relations must fail.

**D. Plaintiff's Motion for a Preliminary Injunction**

 **\*7** It is well-settled in this Circuit that a preliminary injunction is an extraordinary remedy not to be routinely granted. *Rosen v. Siegel,* 106 F.3d 28, 31 (2d. Cir1997)(collecting cases). In order for a preliminary injunction to issue, the plaintiff must demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Western Publ'g Co. v. Rose Art Indus., Inc.,* 910 F.2d 57, 59 (2d Cir.1990). "Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990). Monetary loss may constitute irreparable harm only in the exceptional circumstance that the movant faces "imminent financial ruin" if the injunction does not issue. *National Football League Players Ass'n v. National Football League Properties, Inc.,* No. 90 Civ. 4244, 1991 WL 79325 at \*4 (S.D.N.Y.1991).

Plaintiff requests a preliminary injunction based upon each of its three claims, including its Donnelly Act claim, tortious interference with contract claim, and its tortious interference with business relations claim. In light of the Court's dismissal of the Donnelly Act claim and the tortious interference with business relations claim, the Court will only address Plaintiff's request for a preliminary injunction based upon its claim of tortious interference with contract. On this claim, Plaintiff requests a preliminary injunction enjoining Defendants from interfering with Plaintiff's provision of cleaning and maintenance service to the Tenants, including, but not limited to, an injunction restraining Defendants from (1) preventing Plaintiff's employees from entering the

Case 1:25-cv-05312-JGK Document 17-1 Filed 08/08/25 Page 45 of 46

Shepard Industries, Inc. v. 135 East 57th Street, LLC, Not Reported in F.Supp.2d (1999)
1999 WL 728641, 1999-2 Trade Cases P 72,664

Building to perform work for the Tenants; (2) ejecting Plaintiff's employees from the Building while they are performing work for the Tenants; (3) conditioning Plaintiff's employees' access to the Building on the payment, by either Plaintiff or the Tenants, of fees or other charges including, but not limited to, charges for the freight elevator or security personnel; and (4) enforcing the Lease Renewal Condition and conditioning the granting or renewal of any lease for office space in the Building on Tenant's agreement to retain Defendants or the Favored Contractors as its exclusive providers of supplemental cleaning and maintenance services in the Building. (Am.Compl.¶¶ 58, 67.) With respect to its showing of "irreparable harm," Plaintiff alleges that if it must wait until after trial to regain access to the Building, it will lose the goodwill and reputation with the Tenant–Clients that it has allegedly gained over the past year and a half. (Pl.'s Mem. Law at 9 .) Plaintiff further asserts that the value of this loss would be extremely difficult to determine at trial because the services it provides to its customers are variable, and because at trial it will not know how much business it could have generated from the Tenants otherwise. (Pl.'s Mem. Law at 9.) Finally, Plaintiff argues that the damage to its reputation stemming from its inability to service customers in the Building will impair its ability to solicit new customers generally, and that the damage resulting from this loss of reputation would be extremely difficult, if not impossible, to measure. (Pl.'s Mem. Law at 9–10.)

**\*8** Plaintiff's monetary loss is quantifiable; Plaintiff itself calculates that each month it is not allowed to service the Tenant Clients, it "is losing revenues which aggregate to approximately $24,000." (Am.Compl.¶¶ 56, 65.) Plaintiff takes this figure directly from its monthly billings to the Tenant–Clients as of mid-September, 1997. (Am.Compl.¶ 14.) Furthermore, while damage to goodwill and reputation are intangibles which may constitute irreparable harm, conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm. *National Football League Players Ass'n,* 1991 WL 79325 at \*4. Plaintiff's pleadings, affidavits, and exhibits consist only of conclusory allegations of harm to its goodwill or reputation in the absence of a preliminary injunction. Because Plaintiff has not alleged that it faces imminent financial ruin, and because Plaintiff's damages would be easily calculable at trial, Plaintiff has failed to show a sufficient threat of irreparable harm. Accordingly, the temporary injunctive relief previously ordered by this Court, and subsequently agreed to and extended by the parties, must be vacated.

## E. Leave to Replead

Rule 15(a) of the Federal Rules of Civil Procedure provides that permission to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cohen v. Citibank,* No. 95 Civ. 4826, 1997 WL 88378, at \*2 (S.D.N .Y. Feb. 28, 1997); *accord Intermetals Corp. v. M/V Arctic Confidence,* No. 92 Civ. 1856, 1993 WL 312903, at \*1 (S.D.N.Y. Aug. 12, 1993). Absent a showing of undue delay, bad faith, or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead. *See Protter v. Nathan's Famous Sys., Inc .,* 904 F.Supp. 101, 111 (E.D.N.Y.1995)(citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

Amendment of Plaintiff's Donnelly Act claim would be futile because the relevant geographic market stated by Plaintiff is clearly under-inclusive. Amendment of Plaintiff's claim of tortious interference with business relations also would be futile because Defendants' alleged interference cannot be shown to be criminal or fraudulent. Finally, Plaintiff has not requested leave to amend.

## III. CONCLUSION

For the reasons stated above, the Court hereby GRANTS Defendants' 12(b)(6) motion to dismiss the Donnelly Act and tortious interference with business relations claims, but DENIES Defendants' 12(b)(6) motion to dismiss the tortious interference with contract claim. The Court also hereby GRANTS Defendants' motion to vacate temporary injunctive relief previously ordered by the Court. Plaintiff's motion for preliminary injunctive relief is hereby DENIED.

Defendants are directed to file an answer within twenty (20) days of the date of this Order. The parties are directed to appear for a status conference on Friday, October 29, 1999, at 10:00 a.m.

**\*9** SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 1999 WL 728641, 1999-2 Trade Cases P 72,664

**Shepard Industries, Inc. v. 135 East 57th Street, LLC, Not Reported in F.Supp.2d (1999)**

1999 WL 728641, 1999-2 Trade Cases P 72,664

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---